1   **ART HASAN, CA Bar No. 167323**
    AHasan@lrrc.com
2   **KATHERINE L. QUIGLEY, CA Bar No. 258212**
    KQuigley@lrrc.com
3   **LEWIS ROCA ROTHGERBER CHRISTIE LLP**
    **655 N. Central Avenue, Suite 2300**
4   **Glendale, California 91203-1445**
    **Telephone: (626) 795-9900**
5   **Facsimile: (626) 577-8800**

6   **D. STUART BARTOW, CA Bar No. 233107**
    SBartow@lrrc.com
7   **LEWIS ROCA ROTHGERBER CHRISTIE LLP**
    **4300 Bohannon Drive, Suite 230**
8   **Menlo Park, California 94025**
    **Telephone: (650) 687-8443**
9   **Facsimile: (650) 391-1395**

10  Attorneys for Plaintiff, EMCORE Corporation

11

12                  UNITED STATES DISTRICT COURT

13                  CENTRAL DISTRICT OF CALIFORNIA

14                  LACV18 08077-RSWL-JEMx

15  EMCORE CORPORATION, a New          Case No.
    Jersey Corporation,
16                                      **COMPLAINT FOR**
                Plaintiff,              **DECLARATORY JUDGMENT**
17
           vs.
18                                      **DEMAND FOR JURY TRIAL**
    PHOENIX NAVIGATION
19  COMPONENTS, LLC, a
    Massachusetts Limited Liability
20  Company,

21              Defendant.

22

23

24

25

26

27

28

-1-

Plaintiff EMCORE Corporation ("EMCORE" or "Plaintiff"), through its undersigned counsel, brings this action against Defendant Phoenix Navigation Components, LLC ("Defendant"). In support of its Complaint, Plaintiff alleges as follows:

## PARTIES

1.      EMCORE is a New Jersey corporation with its principal place of business at 2015 Chestnut Street, Alhambra, California.

2.      On information and belief, Defendant is a limited liability company organized under the laws of Massachusetts, with its principal place of business at 7 Alma Road, Walpole, Massachusetts.

## JURISDICTION AND VENUE

3.      This is a civil action arising under the Patent Laws of the United States, 35 U.S.C. § 100 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. 2201 *et seq.* EMCORE seeks a declaration under, *inter alia*, 35 U.S.C. §§ 100, 256 and 261 that: (1) the inventors listed on U.S. Pat. No. 8,773,665 ("the '665 Patent")—Ronald T. Logan, Jr. and Ka Kha Wong—and no other individuals, are the true and correct inventors of the subject matter described and claimed in the '665 Patent; and (2) EMCORE is the sole owner of the '665 Patent and that Phoenix has no rights in or to the '665 Patent.

4.      This Court has subject matter jurisdiction over this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has specific personal jurisdiction over Defendant because this action arises out of Defendant's purposefully directed activities towards Plaintiff within this judicial district. In particular, Defendant has continuously and systematically engaged in business relations with Plaintiff within this judicial district. Defendant has directly offered and sold its services to EMCORE within this judicial district.

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

6.      Venue is proper in this forum pursuant to 28 U.S.C. § 1391(b) and (c) and/or 28 U.S.C. § 1400(b).

**FACTUAL BACKGROUND AND NATURE OF ACTION**

7.      U.S. Patent No. 8,773,665 ("the '665 Patent"), entitled "Compact Fiber Optic Gyroscope," was issued by the United States Patent and Trademark Office ("USPTO") on July 8, 2014.  A true and correct copy of the '665 Patent is attached hereto as **Exhibit 1**.

8.      The title page of the '665 Patent lists two inventors: Ronald T. Logan, Jr., of Pasadena, California, and Ka Kha Wong, of Alhambra, California. Both Mr. Logan and Mr. Wong are employees of EMCORE.  In or around 2011, Messrs. Logan and Wong formally assigned their rights in and to the '665 Patent to EMCORE.  EMCORE owns the entire right, title and interest in and to the '665 Patent.

9.      EMCORE's patented technology stands apart from other conventional fiber optic gyroscopes (FOGs), because EMCORE's technology includes specialized transceivers and integrated optical circuits (IOC), the configurations and specifications of which allow for the construction of highly accurate, compact FOGs.  Beginning at least as early as 2005, EMCORE spent numerous years designing and developing compact transceivers and IOCs with the goal of developing a compact FOG product line.  The specific transceiver and IOC features described and claimed in the '665 Patent, in combination with other conventional features of a FOG, were conceived and developed exclusively by EMCORE employees Logan and Wong.

10.     EMCORE is a leading provider of advanced fiber optic technology, including transceiver and IOC technology for enabling compact and accurate FOGs.  EMCORE has been a leader in fiber optic technology for over thirty years, and has been awarded a number of patents in the field.

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

11.     In 2007, one of EMCORE's customers brought to EMCORE a non-functioning FOG it had purchased and deployed from a company called Fizoptika.  The customer requested that EMCORE develop a FOG with the same "form, fit, and function" as its FOG, albeit using EMCORE's transceiver and IOC technology, in order to retrofit the customer's existing products.

12.     In 2008, EMCORE and Defendant began doing business together, entering into a Mutual Proprietary Information Agreement governed by California law.

13.     Subsequently, between 2008 and 2011, EMCORE and Defendant entered into two agreements—the terms of which are not at issue here—under which Defendant would provide certain engineering services to EMCORE.

14.     In 2011, EMCORE filed a patent application for a compact fiber optic gyroscope including the advanced transceiver and IOC design conceived of and developed by Messrs. Logan and Wong, which later resulted in the issuance of the '665 Patent.

15.   The scope of the patent is set forth in the claims, which recite a compact fiber optic gyroscope with various components of the transceiver and IOC, the incorporation of which allows for the construction of a fiber optic gyroscope that was more compact and accurate than existing designs with substantially the same form, fit and function.   The USPTO Examiner specifically listed and emphasized the elements of the transceiver in the "Reasons for Allowance" of the '665 Patent—in particular, "wherein the transceiver module comprises:   a second house . . . a non-coherent light source . . . an optical circulator . . . a focusing lens . . . and first and second photodiodes . . ." in combination with the remaining limitations of the claim.   This novel transceiver technology, used in combination with the other recited limitations of the claims, was developed exclusively by Messrs. Logan and Wong, not any personnel associated with Defendant.

16.   Figure 6 in the '665 Patent is a diagram of a generalized structure of the fiber optic gyroscope, without detailing the claimed internal components of the transceiver and other components.   The similarity between Figure 6 and a figure from Defendant's "EMP-1 (Proto FOG) Design Review," is that the figures depict a generalized high level layout of a fiber optic gyroscope.   Accordingly, there is nothing in the presentation that can qualify as an inventive contribution apart from the transceiver and IOC design advances made exclusively by Messrs. Logan and Wong on behalf of EMCORE prior to 2008.

17.   As Defendant admits in its "EMP-1 (Proto FOG) Design Review" presentation, the general configuration of the EMP-1 was a "form, fit & function" replacement for the Fizoptika FOG, meant to retrofit existing products.   With the exception of the inclusion of EMCORE's novel, proprietary transceiver and IOC in a closed-loop system, the form of a Fizoptika device bears substantially the same layout as the prototype EMP-1, as shown below:

Lewis Roca
ROTHGERBER CHRISTIE

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445



**Figure from Phoenix's**

**"EMP-1 (Proto FOG) Design Review"**

------------------------------------------------------------



**Fizoptika Device from EMCORE customer in 2007**

-6-

18. One skilled in the art of FOG designs and layouts would immediately see that the primary difference between the figure from Defendant's presentation and the layout of the Fizoptika device, is that Defendant's figure incorporates a transceiver and IOC, whereas the Fizoptika device includes separate and discrete source, detector and IOC components. Messrs. Logan and Wong exclusively invented the transceiver and IOC components reflected in Defendant's presentation and in the '665 Patent.

19. Defendant has repeatedly stated that the transceiver and IOC constitute EMCORE's exclusive technology. The remaining layout shown in Defendant's presentation encompasses a basic layout well-known in the industry. The fundamental inventive contribution leading to the '665 Patent was conceived and developed exclusively by Messrs. Logan and Wong. Accordingly, they are the true and correct inventors named on the '665 Patent.

20. In late 2014, EMCORE relocated its corporate headquarters from Albuquerque, New Mexico, to Alhambra, California, which is within this judicial district. After the move, EMCORE and Defendant continued to do business together, including within this judicial district.

21. However, the business arrangements did not go as planned, and over the course of several years EMCORE was forced to spend very significant sums of money—over $6.6 million—re-developing technology that Defendant had previously represented to EMCORE as being functional and close to production even prior to the parties' contractual agreements.

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

22.     On June 12, 2018, Defendant filed a Demand for Arbitration against EMCORE with the American Arbitration Association ("AAA") based upon the arbitration provisions contained in the parties' agreements.  Defendant's original Demand alleged counts for breach of contract, breach of the covenant of good faith and fair dealing, misappropriation of trade secrets, conversion, and unjust enrichment.

23.     On August 31, 2018, Defendant filed a First Amended Demand for Arbitration against EMCORE in the AAA arbitration proceeding.  In its First Amended Demand, Defendant added two new patent counts: (1) Count IX for correction of inventorship pursuant to 35 U.S.C. § 256, alleging that two of Defendant's members, Glen Gage and Robert Hansen, are the "true and sole inventors" of the subject matter disclosed and claimed in the '665 Patent; and (2) Count X for a declaration that Defendant, not EMCORE, is the sole owner of the '665 Patent.  The First Amended Demand which was designated as "Highly Confidential" by Defendant, attached hereto as **Exhibit 2**, was the first occasion on which Defendant purported to challenge the inventorship and ownership of the '665 Patent.

24.     In the First Amended Demand, Defendant alleges:  "Phoenix employees, Glen Gage and Robert Hansen, fully conceived and reduced to practice the invention claimed in the '665 Patent and are thus the true and sole inventors of such."  (Am. Demand ¶ 135.)  As described above, this is not true.  Messrs. Logan and Wong are the true and correct inventors of the inventive subject matter claimed in the '665 Patent.

25.     In the First Amended Demand, Defendant also alleges:  "Mr. Gage and Mr. Hansen, both Phoenix employees, are the true and only inventors of the '665 Patent.  Mr. Gage and Mr. Hansen have assigned their ownership rights in the invention to Phoenix."  (Am. Demand ¶ 138.)  As described above, this is not true.  Messrs. Logan and Wong are the true and correct inventors of the inventive

subject matter claimed in the '665 Patent, and EMCORE is the sole owner of the '665 Patent by way of assignment from Messrs. Logan and Wong.

26.     The patent claims asserted by Defendant in the First Amended Demand (Counts IX and X) do not arise out the parties' agreements and therefore, are not subject to the arbitration provisions contained in those agreements.  Under the 1982 Amendments to the Patent Act, codified at 35 U.S.C. § 294, arbitration of patent claims cannot be compelled absent an express written agreement by the parties to arbitrate such claims.   Here, the parties never agreed to arbitrate Defendant's patent claims and therefore, jurisdiction over such claims is properly before this Court.

## STANDING – CASE OR CONTROVERSY

27.     There is an immediate, actual, and justiciable controversy between EMCORE and Defendant concerning the inventorship and ownership of the '665 Patent that is within the jurisdiction of this court under 28 U.S.C. §§ 2201 and 2202.  Pursuant to 35 U.S.C. § 100 (f), "inventor" means "the individual or, if a joint invention, the individuals collectively who invented or discovered the subject matter of the invention."   Messrs. Logan and Wong are the only true and correct inventors of the subject matter of the '665 Patent under § 100 (f), and EMCORE is the sole owner of the '665 Patent.  Correction of inventorship of the '665 Patent under 35 U.S.C. §256 is not warranted, and should be denied.

## COUNT ONE

### (Declaratory Judgment of Correct Inventorship of the '665 Patent)

28.     EMCORE realleges and incorporates by reference the allegations contained in paragraphs 1-27 of this Complaint as if set forth in their entirety herein.

29.     There is an actual and justiciable controversy between the parties arising under the Patent Act, in particular under 35 U.S.C. §§ 100 and 256 concerning the correct inventorship of the '665 Patent.

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

30.     Ronald T. Logan, Jr. and Ka Kha Wong of Alhambra, California, are the true, correct, and sole inventors of the inventions disclosed and claimed in the '665 Patent.

31.     EMCORE, as the owner and assignee of the '665 Patent, is entitled to a judicial declaration that the inventorship listed on the '665 Patent is correct, and that Messrs. Logan and Wong are the true, correct, and sole inventors of the inventions disclosed and claimed in the '665 Patent.

## COUNT TWO

### (Declaratory Judgment of Ownership of the '665 Patent)

32.     EMCORE realleges and incorporates by reference the allegations contained in paragraphs 1-31 of this Complaint as if set forth in their entirety herein.

33.     There is an actual and justiciable controversy between the parties arising under the Patent Act, in particular 35 U.S.C. §§ 100, 256 and 261 concerning the correct ownership of the '665 Patent.

34.     Messrs. Logan and Wong are the true, correct, and sole inventors of the '665 Patent.  Messrs. Logan and Wong have assigned their ownership rights in the invention to EMCORE.

35.     EMCORE, as the owners and assignee of the '665 Patent is entitled to a judicial declaration that EMCORE is the sole owner of the '665 Patent.

## REQUEST FOR JURY TRIAL

36.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, EMCORE demands a trial by jury for all issues so triable.

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

## REQUEST FOR RELIEF

WHEREFORE, EMCORE requests that this Court enter judgment in its favor and against Phoenix as follows:

    a.    Declaring that Messrs. Ronald T. Logan, Jr. and Ka Kha Wong are correctly named as joint inventors on the '665 Patent;

    b.    Declaring that Messrs. Glen Gage and Robert Hansen are not inventors of any claim of the '665 Patent;

    c.    Declaring that EMCORE is the sole owner of the '665 Patent;

    d.    Declaring that Phoenix has no rights in or to the '665 Patent;

    c.    Holding this case to be exceptional and awarding EMCORE its attorneys' fees under 35 U.S.C. § 285;

    d.    Awarding EMCORE its costs pursuant to Fed. R. Civ. P. 54(d); and

    e.    Granting any other relief as the Court deems just and proper.


DATED:  September 17, 2018        Respectfully submitted,

LEWIS ROCA ROTHGERBER
CHRISTIE LLP


By _____
    Art Hasan

Attorneys for Plaintiff
EMCORE Corporation

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

## __DEMAND FOR JURY TRIAL__

Plaintiff Timely Inventions, LLC, pursuant to Federal Rule of Civil Procedure 38, hereby demands a trial by jury of all issues so triable.

DATED:  September 17, 2018

Respectfully submitted,

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By _____
    Art Hasan

Attorneys for Plaintiff
EMCORE Corporation

655 N. Central Avenue
Suite 2300
Glendale, CA 91203-1445

Lewis Roca
ROTHGERBER CHRISTIE

-12-

# EXHIBIT 1



US008773665B1

(12) **United States Patent**
Logan, Jr. et al.

(10) **Patent No.:** **US 8,773,665 B1**
(45) **Date of Patent:** **Jul. 8, 2014**

(54) **COMPACT FIBER OPTIC GYROSCOPE**

(75) Inventors: **Ronald T. Logan, Jr.**, Pasadena, CA (US); **Ka Kha Wong**, Alhambra, CA (US)

(73) Assignee: **Emcore Corporation**, Albuquerque, NM (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 356 days.

(21) Appl. No.: **13/078,428**

(22) Filed: **Apr. 1, 2011**

(51) **Int. Cl.**
*G01C 19/72* (2006.01)

(52) **U.S. Cl.**
USPC ........................................... **356/460**

(58) **Field of Classification Search**
CPC .... G01C 19/72; G01C 19/722; G01C 19/723; G01C 19/725; G01C 19/726; G01C 19/727; G01C 19/728
USPC .................. 356/460, 461; 73/504.01, 504.02
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,373,814 | A | * | 2/1983 | Lacombat et al. ............. 356/460 |
| 4,615,582 | A | * | 10/1986 | Lefevre et al. ..................... 385/4 |
| 5,444,534 | A | * | 8/1995 | Dyott et al. ................... 356/465 |
| 5,677,767 | A | | 10/1997 | Shirasaki et al. |
| 5,686,990 | A | * | 11/1997 | Laznicka, Jr. ................. 356/460 |
| 5,719,674 | A | | 2/1998 | Martin et al. |
| 5,818,589 | A | | 10/1998 | Scholz et al. |
| 6,034,924 | A | | 3/2000 | Vakoc |
| 6,201,923 | B1 | * | 3/2001 | Yuhara et al. ................ 385/137 |
| 6,278,657 | B1 | | 8/2001 | Vakoc |
| 6,351,310 | B1 | | 2/2002 | Emge et al. |
| 6,377,391 | B1 | | 4/2002 | Vakoc et al. |

| | | | |
|---|---|---|---|
| 6,466,364 | B1 | 10/2002 | Vakoc et al. |
| 6,529,444 | B2 | 3/2003 | Vakoc |
| 6,667,935 | B2 | 12/2003 | Vakoc |
| 6,678,211 | B2 | 1/2004 | Vakoc |
| 7,417,740 | B2 | 8/2008 | Alphonse et al. |
| 7,746,476 | B2 | 6/2010 | Demers et al. |
| 2002/0097636 | A1 | 7/2002 | Vakoc |
| 2002/0145795 | A1 | 10/2002 | Vakoc et al. |
| 2002/0191937 | A1 | 12/2002 | Knox et al. |
| 2003/0043696 | A1 | 3/2003 | Vakoc |
| 2003/0043697 | A1 | 3/2003 | Vakoc |
| 2003/0123064 | A1 | 7/2003 | Szafraniec et al. |

(Continued)

OTHER PUBLICATIONS

U.S. Appl. 13/158,865, Jun. 13, 2011, Logan et al.

*Primary Examiner* — Michael A Lyons
*Assistant Examiner* — Shawn Decenzo

(57) **ABSTRACT**

A compact fiber optic gyroscope including a first housing; a transceiver module disposed in the first housing, the transceiver module including a second housing; a non-coherent light source disposed in the second housing for producing a first beam of light; a single lens for focusing the first beam of light; an optical circulator disposed in the second housing and in the path of the first beam of light to produce polarized second and third beams respectively, with polarization orthogonal to each other; and first and second photodiodes disposed in the second housing and coupled to the optical circulator, wherein the first photodiode is a transmit monitor photodiode coupled to the second beam, and the second photodiode is a receiver photodiode. The first housing further includes a planar optical fiber loop having a first end and a second end; a phase modulator coupled to the third beam emitted from the transceiver module to produce fourth and fifth beams coupled to the first and the second end respectively of the optical fiber loop respectively, and for receiving the return sixth and seventh beams from the second and the first ends respectively of the optical fiber loop.

**19 Claims, 4 Drawing Sheets**



**EXHIBIT 1**
**Page 13**

## US 8,773,665 B1
Page 2

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2006/0139727 A1 * | 6/2006 | Gafsi et al. .................... 359/280 | |
| 2007/0030491 A1 | 2/2007 | Ohno et al. | |
| 2007/0097374 A1 | 5/2007 | Ren-Young | |

| | | | |
|---|---|---|---|
| 2009/0015843 A1 | 1/2009 | Demers et al. | |
| 2010/0220332 A1 | 9/2010 | Digonnet | |
| 2010/0301352 A1 | 12/2010 | Strandjord et al. | |
| 2011/0037972 A1 | 2/2011 | Bergh | |
| 2013/0033737 A1 | 2/2013 | Logan et al. | |

* cited by examiner

**EXHIBIT 1**
**Page 14**

**U.S. Patent**        Jul. 8, 2014        Sheet 1 of 4        US 8,773,665 B1



FIG.1

Prior Art

EXHIBIT 1

Page 15



**FIG.2**
Prior Art



**FIG.3**
Prior Art

**EXHIBIT 1**
**Page 16**



FIG.4



FIG.5

**EXHIBIT 1**
**Page 17**



FIG.6

**EXHIBIT 1**
**Page 18**

US 8,773,665 B1

**1**

# COMPACT FIBER OPTIC GYROSCOPE

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention relates to fiber optic gyroscopes (FOGs) and in particular to integration techniques that implement a single-axis FOG transceiver subassembly having high accuracy and low noise in a small, compact cylindrical form factor.

### 2. Description of the Related Art

A FOG is a device that uses the propagation of light beams in an optical fiber coil to detect mechanical rotation of the fiber coil. The sensor is a coil of as much as 5 km or more of optical fiber. The typical implementation provides that two light beams be launched into the fiber in opposite directions. Due to an optical phenomenon known as the Sagnac effect, the beam traveling against the rotation experiences a slightly shorter path than the other beam resulting in a relative phase shift. The amount of the phase shift of the original two beams can be measured by determining how the beams interfere with each other when they are combined. The intensity of the combined beam then depends on the rotation rate of the fiber coil about its axis.

A FOG provides extremely precise rotational rate information, in view of its lack of cross-axis sensitivity to vibration, acceleration, and shock. Unlike the classic spinning-mass gyroscope, the FOG has virtually no moving parts and no inertial resistance to movement. The FOG also can provide higher resolution than a ring laser gyroscope and is utilized in inertial navigation systems requiring a very high degree of accuracy.

There are two types of FOG systems, closed loop and open loop. In a closed loop system, a feedback path is defined so as to maintain the phase difference between the light beams constant after the beams exit the ends of the fiber coil. The amount of feedback phase needed to maintain the fixed phase relation is therefore indicative of the rate of rotation of the coil about its axis.

Open loop FOG systems calculate the rotation rate by way of amplitude measurements taken along an interference curve that results when the two exiting light beams are recombined.

## SUMMARY OF THE INVENTION

### 1. Objects of the Invention.

It is an object of the present invention to provide a fiber optic gyroscope in a small, highly integrated form factor.

It is another object of the present invention to provide a single-axis fiber optic gyroscope in a single integrated housing.

It is also another object of the present invention to provide a fiber optic gyroscope having high accuracy and low noise using an integrated opto-electronic transceiver subassembly.

It is also another object of the present invention to provide a fiber optic gyroscope having a rotational rate drift of less than 1 degree per hour.

It is another object of the present invention to provide a fiber optic gyroscope having noise measured in angular degrees random walk per square root of hour of less than 0.02 degrees.

It is also another object of the present invention to provide a fiber optic gyroscope capable of recording angular rate changes of greater than 500 degrees per second.

It is also another object of the present invention to provide a fiber optic gyroscope having a closed loop feedback path so as to maintain the phase difference between the light beams constant after the beams exit the ends of the fiber coil.

**2**

It is still another object of the present invention to provide a fiber optic gyroscope that may be manufactured to a specified degree of accuracy by changing the fiber coil length and by programming an internal processor.

It is still another object of the present invention to provide a fiber optic gyroscope that is operable over a wide performance range that may be adapted by the user to a specified degree of accuracy or noise tolerance by changing certain parameters, such as fiber coil length, of the unit.

Some implementations may achieve fewer than all of the foregoing objects.

Additional objects, advantages, and novel features of the present invention will become apparent to those skilled in the art from this disclosure, including the following detailed description as well as by practice of the invention. While the invention is described below with reference to preferred embodiments, it should be understood that the invention is not limited thereto. Those of ordinary skill in the art having access to the teachings herein will recognize additional applications, modifications and embodiments in other fields, which are within the scope of the invention as disclosed and claimed herein and with respect to which the invention could be of utility.

### 2. Features of the Invention

Briefly, and in general terms, the present disclosure provides a compact fiber optic gyroscope including a first housing; a transceiver module disposed in the first housing, and including a second housing; a non-coherent light source disposed in the second housing for producing a first beam of light; an optical circulator disposed in the second housing and in the path of the first beam of light to produce polarized second and third beams respectively, with polarization orthogonal to each other; and first and second photodiodes disposed in the second housing and coupled to the optical circulator, wherein the first photodiode is a transmit monitor photodiode coupled to the second beam, and the second photodiode is a receiver photodiode; a planar optical fiber loop disposed in the first housing and having a first end and a second end; a phase modulator disposed in the first housing and coupled to the third beam from the transceiver module to produce fourth and fifth beams coupled to the first and the second end respectively of the optical fiber loop respectively, and receiving the return sixth and seventh beams from the second and the first ends respectively of the fiber loop, and coupling the return sixth and seventh beams to the receiver photodiode in the transceiver module; and a processor disposed in the first housing and coupled to the receiver photodiode for determining the phase relationship between the two counter propagating beams in the fiber loop and thereby determining the rotational rate of the planar optical fiber loop with respect to an axis.

The optical circulator can include a polarizing beam splitter.

The optical circulator can further include a Faraday rotator coupled to an output of the polarizing beam splitter.

The phase modulator may be a lithium niobate modulator.

The phase modulator may have an output pair of optical fibers which may be spliced to the first end and the second end respectively of the planar optical fiber loop.

The planar optical fiber loop can be circumferentially disposed around the interior periphery of the first housing.

The first housing may be cylindrically shaped and the planar optical fiber loop may be circumferentially disposed around the interior periphery of the first housing.

The first housing may be cylindrically shaped having dimensions of approximately 80 mm in diameter, and 20 mm in height.

**EXHIBIT 1**
**Page 19**

US 8,773,665 B1

| 3 | 4 |

The weight of the gyroscope may be 160 grams or less.

The second housing may be a hermetically sealed butterfly package.

The rotational rate of the gyroscope may have a drift of between 0.005 and 1.0 degrees per hour.

The rotational rate of the gyroscope may have a drift that is adjustable by the user to a desired operational range.

The rotational rate of the gyroscope may have a drift that is operable over an operational range of up to 1.0 degree per hour.

The noise measured in angular degrees random walk per square root of hour of the gyroscope may be less than 0.02 degrees.

The noise tolerance of the gyroscope may be selected by the user to a desired angular degrees random walk per square root of hour.

The length of the fiber optic loop may be greater than 180 meters.

The length of the fiber optical loop of the gyroscope may be selected by the user to a desired length.

In another aspect of the invention, the present disclosure provides a transceiver subassembly for a fiber optic gyroscope including a housing; a non-coherent light source disposed in the housing for producing a first beam of light; a single focusing lens disposed in the housing directly adjacent to the light source; a polarizing beam splitter disposed in the housing and disposed in the path of the first beam of light for producing a second and a third beam respectively, with polarization orthogonal to each other; a monitor photodiode disposed in the housing and disposed in the path of the second beam to monitor the intensity of the second beam; a Faraday rotator disposed in the housing and disposed in the path of the third beam; a single input/output optical fiber directly adjacent to and optically coupled to the Faraday rotator; and a receiver photodiode disposed in the housing and coupled to the Faraday rotator for receiving an input optical signal from the input/output optical fiber.

The polarizing beam splitter can direct the S polarization of the initial beam of light from the incoherent source through and into the Faraday rotator.

The polarizing beam splitter can direct the P polarization of the initial beam of light from the incoherent source onto a power monitoring photodiode.

The polarizing beam splitter may direct the return light of the P polarization to the receiver photodiode.

The optical circulator can include a Faraday rotator, and the polarizing beam splitter can couple the light of S polarization to the Faraday rotator.

A monitor photodiode can be coupled to the polarizing beam splitter for monitoring the light of P polarization from the light source.

The transceiver module may include a single input/output optical fiber coupled to the optical circulator.

The single input/output optical fiber may terminate in a pig tail.

The single input/output optical fiber may be coupled to a lithium niobate modulator having an input optical fiber which may be spliced to the end of the pig tail input/output optical fiber extending from the transceiver.

The transceiver module may include a single lens disposed adjacent to the non-coherent light source for coupling the first beam from the light source through the optical circulator to focus on the input/output optical fiber.

The Faraday rotator may change the polarization of the S polarized return sixth and seventh beams to a P polarized eighth beam, and the polarizing beam splitter may then direct the P polarized eighth beam to the receiver photodiode.

Some implementations of the present invention may incorporate or implement fewer of the aspects and features noted in the foregoing summaries.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features and advantages of this invention will be better understood and more fully appreciated by reference to the following detailed description when considered in conjunction with the accompanying drawings wherein:

FIG. 1 is a highly simplified block diagram of a prior art single-axis fiber optic gyroscope;

FIG. 2 is a detailed block diagram of a transceiver subassembly in a prior art single-axis fiber optic gyroscope;

FIG. 3 is a top plan view of the transceiver subassembly in a prior art single-axis fiber optic gyroscope;

FIG. 4 is a detailed block diagram of the transceiver subassembly in a single-axis fiber optic gyroscope according to the present disclosure;

FIG. 5 is a top plan view of the transceiver subassembly of FIG. 4; and

FIG. 6 is an exploded perspective view of an embodiment of a compact single-axis fiber optic gyroscope according to the present disclosure.

The novel features and characteristics of the invention are set forth in the appended claims. The invention itself, however, as well as other features and advantages thereof, will be best understood by reference to a detailed description of a specific embodiment, when read in conjunction with the accompanying drawings.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Details of the present invention will now be described, including exemplary aspects and embodiments thereof. Referring to the drawings and the following description, like reference numbers are used to identify like or functionally similar elements, and are intended to illustrate major features of exemplary embodiments in a highly simplified diagrammatic manner. Moreover, the drawings are not intended to depict every feature of actual embodiments or the relative dimensions of the depicted elements, and are not drawn to scale.

FIG. 1 depicts a highly simplified diagram of a single-axis fiber optic gyroscope (FOG) transceiver subassembly as is known in the prior art. The diagram shows a fiber-coupled broadband source, e.g. a super luminescent diode (SLD) 101 for producing a non-coherent beam of light, and a directional coupler 102 in the path of the beam. A lithium niobate (LiNbO$_3$) phase modulator or FOG chip 105 is provided in a first path 104 from the output of the directional coupler, and a power monitoring photodiode 103 is provided in a second path 110 from the output of the directional coupler. A fiber loop or coil 108 with a fiber having a first 106 and second 107 end is coupled to the output of the phase modulator 105.

Light from the SLD 101 is split in the Y-junction of the phase modulator 105 and each path through the phase modulator is modulated before being applied to the first 106 and second 107 ends of the fiber loop 108 and counter-propagated through the coil. The optical signals that pass back through the phase modulator 105, are recombined in the Y-junction in the phase modulator and propagate back along path 104 to the directional coupler 102, whereby the return optical beam is then focused onto a receiving photodiode 109 where the intensity produces an electrical signal. The electrical signal is

**EXHIBIT 1**

**Page 20**

US 8,773,665 B1

5

processed externally of the transceiver subassembly to compute the rotation rate of the coil 108 to provide inertial guidancy information.

Rotation in the plane of the fiber coil induces a change in the phase relationship of the two counter propagating beams, known as the Sagnac effect. The phase change may be measured as an intensity fluctuation on the receiving photodiode and further processing of the electrical signal may be used directly to determine the rotational rate of the coil. Since there is only one fiber loop and one plane, such measurement is a one-axis inertial measurement.

FIG. 2 depicts a more detailed block diagram of a prior art single-axis FOG transceiver subassembly 200. In an effort to decrease cost, size, and parts count, the SLD 201, a collimating lens 202, an optical circulator (implemented with a polarizing beam-splitter, or PBS 203, a Faraday rotator 207), a power monitoring photodiode 205, a receiver photodiode 214, and a trans-impedance amplifier (TIA) 215 are integrated into an extremely small housing or form factor package 200. One optical output beam of the PBS 203 is coupled through a Faraday rotator 207, which is in turn coupled to a focusing GRIN lens 208 which couples the beam emanating from the Faraday rotator 207 to the I/O optical fiber 209 extending from the housing 200. Another optical output beam 204 of the PBS 203 is coupled to a monitor photodiode 205. Outputs 216 of the trans-impedance amplifier (TIA) 215 are coupled the external processing circuitry.

The subassembly 200 further includes a thermal control unit 217 including a thermal electric cooler (TEC) 218 and a thermistor 219. The TEC 218 extends over the length of the unit incorporating the SLD 201, collimating lens 202, PBS 203, and Faraday rotator 207, and GRIN lens 208 so as to maintain a uniform temperature over all subcomponents.

One such embodiment of such a single-axis FOG transceiver subassembly 200 is a commercial product known as the FOG PB3010 transceiver module manufactured by Emcore Corporation in Alhambra, Calif.

FIG. 3 is a top plan view of the prior art FOG shown in FIG. 2 with the lid of the housing removed to show the internal components. The Figure depicts the SLD 201, and a collimating lens 202 adjacent thereto. A polarizing beam-splitter or PBS 203 is disposed in the path of the beam from lens 202, and the transmitter monitor photodiode 205 located on one side of the PBS 203, and the receiver photodiode 214 located on a printed circuit board on the other side of the PBS 203. A trans-impedance amplifier (TIA) is also mounted on the printed circuit board, and is coupled to the photodiode 214 to produce the output electrical signal. The optical output beam of the PBS 203 is coupled through a Faraday rotator 207, which is in turn coupled to a focusing GRIN lens 208 which couples the beam emanating from the Faraday rotator 207 to the I/O optical fiber extending from the housing 200.

In the device illustrated in FIGS. 2 and 3, 96% of the optical output from the SLD 201 is in the out-of-plane polarization (S polarization) while the remaining 4% is in the in-plane polarization (P polarization). The polarizing beam splitter 203 reflects the P polarization from the SLD 201 onto the power monitoring photodiode 205 but passes the S polarization. The light then passes through the Faraday rotator 207 unaltered and is coupled at 211 into the fiber 213 with a lens 208. From this point the S polarized light travels through the rest of the fiber loop 213 until it returns at the second end 212 in the same polarization state as when it left. When the light passes through the Faraday rotator 207 in this direction (i.e. back towards the SLD 201) the polarization is rotated into the P state. The polarizing beam splitter 203 then reflects the optical return signal onto the receiving photodiode 214 that pro-

6

duces an electrical output directly connected to an internal TIA 215 and provides a typical gain of 10,000.

FIG. 4 is a highly simplified diagram of a single-axis FOG transceiver subassembly 400 with a single focusing lens 401 for focusing the light beam from the SLD 201 onto the optical circulator (implemented with a polarizing beam-splitter, or PBS, and a Faraday rotator 207), according to an embodiment of the present disclosure. The focusing lens 401 is positioned in the optical path between the SLD 201 and the optical circulator instead of using a collimating lens, and focuses the light beam over the optical path from the SLD 201 through the optical circulator including the Faraday rotator 207 to an optical focus point at the end 403 of the polarization-maintaining input/output optical fiber 402 for optically coupling the light beam to exterior of the FOG assembly 400. This way, the focusing GRIN lens conventionally placed in the light path between the Faraday rotator 207 and the internal fiber 402 (e.g. the focusing GRIN lens 208 in FIG. 2) and the collimating lens conventionally placed in the optical path between the SLD 201 and the optical circulator (e.g. lens 202 in FIG. 2) need not be utilized in the subassembly. Eliminating the additional lens may permit easier alignment and be able to permit a smaller form factor package. The input/output optical fiber 402 typically terminates in a "pig-tail" exterior of the FOG transceiver subassembly 400, whereby in some embodiments it may be spliced to the modulator 210 or other optical components.

The subassembly 400 further includes a thermal control unit 217 including a thermal electric cooler (TEC) 218 and a thermistor 219. The TEC 218 extends over the length of the unit incorporating the SLD 201, focusing lens 401, PBS 203, and Faraday rotator 207 so as to maintain a uniform temperature over all subcomponents.

FIG. 5 is a top plan view of the FOG assembly 400 shown in FIG. 4 with the lid of the housing 404 removed to show the internal components. The focusing lens 401 is positioned between the SLD 201 and the optical circulator as described above. The PBS 203 component of the optical circulator is disposed in the path of the light beam from the focusing lens 401, and the transmitter monitor photodiode 205 located on one side of the PBS 203, and the receiver photodiode 214 located on a printed circuit board on the other side of the PBS 203. A trans-impedance amplifier (TIA) 215 is mounted on the printed circuit board and coupled to the photodiode 214 for producing the output electrical signal. The optical output beam from the PBS 203 is coupled through a Faraday rotator 207, which is in turn directly coupled to internal fiber 402 which couples to the external I/O optical fiber 402 extending from the housing 404.

FIG. 6 is an exploded perspective view of an embodiment of a single-axis fiber optic gyroscope according to the present disclosure. The unit includes a metallic housing formed from a base plate 601 and a top cover 602. In one embodiment, the housing may be cylindrically shaped having dimensions of 80 mm in diameter and 20 mm in height. In one embodiment, the weight of the entire gyroscope is 160 grams. The housing may be composed of a suitable magnetically shielding material.

The base plate 601 includes an annular cavity 603 around the periphery thereof for securing a portion of the fiber coil 604. In one embodiment, the fiber coil 604 may be 200 meters in length, in which case the gyroscope may be considered a low accuracy model. In another embodiment, the fiber coil 604 may be 500 to 1000 meters in length, in which case the gyroscope may be considered a medium accuracy model. In another embodiment, the fiber coil 604 may be over 2 kilometers in length, in which case the gyroscope may be considered a high accuracy model.

EXHIBIT 1
Page 21

US 8,773,665 B1

7

The base plate **601** further includes a support or mount **605** for mounting the phase modulator **210**. Above the base plate **601** is a first printed circuit board **606** on which the transceiver and other electronic components may be mounted. Above the first printed circuit board **606** is a second printed circuit board **607** which includes the processor **608** and other digital components, and an external input/output connector **609** which extends through an opening **610** in the top cover **602**. The first printed circuit board **606** and the second printed circuit board **607** may be connected by an inter-board electrical connector **611**. In one embodiment the processor may be a digital signal processor having a sufficiently high clock rate or processing speed to allow rate changes in the angular orientation of the fiber coil **213** of greater than 2000 degrees, and up to 3000 degrees per second, or more, to be processed and reported.

Depending upon the length of the fiber coil the housing may be suitably sized in both diameter and height, and appropriate programming of the software associated with the processor to account for the fiber coil length, the fiber optic gyroscope as described above may be specified to have the following performance parameters:

TABLE

| Coil length | Rotational Rate Drift | Noise |
|---|---|---|
| 200 meters | 0.5 degrees/hour | 0.0200 degrees/square root-hour |
| 1200 meters | 0.01 degrees/hour | 0.0017 degrees/square root-hour |

Thus, one embodiment of a fiber optic gyroscope as described above has a rotational rate drift of less than 0.01 degrees per hour, and noise, measured in angular degrees random walk per square root of an hour, of less than 0.0017 degrees per square-root-hour.

In some embodiments, the rotational rate has a drift of between 0.005 and 1.0 degrees per hour.

In some embodiments, the noise measured in angular degrees random walk per square root of hour is between 0.001 and 0.02 degrees.

In some embodiments, the length of the fiber coil is between 100 m and 2 km.

In some embodiments, the drift of the rotational rate, the noise measured in angular degrees random walk per square root of hour, and the length of the fiber coil, may be adjusted or selected by the user to achieve a desired performance or operational capability.

The present disclosure contemplates that the fiber coil length selected, and the software appropriately programmed for the fiber coil length, so the fiber optic gyroscope as described above may be operationally specified to meet the customer's or application's desired performance parameters substantially within the ranges suggested above using currently available components.

While the present disclosure illustrates and describes a fiber optic gyroscope, it is not intended to be limited to the details shown, since various modifications and structural changes may be made without departing in any way from the spirit of the present disclosure.

It will be understood that each of the elements described above, or two or more together, also may find a useful application in other types of constructions differing from the types described above. In particular, certain configurations presented according to particular aspects of the present invention have been shown and described as discrete elements, i.e., lasers, splitters, combiners, mirrors, lenses, shifters, fiber optical cable, etc. Those skilled in the art will readily appreciate that many or all of these individual, discrete components

8

may be fabricated and/or packaged into integrated elements. By way of particular example, the use of integrated waveguides and associated structures is envisioned for the described structures and arrangements. Alternatively, the discrete elements, i.e., lasers, splitters, combiners, mirrors, lenses, shifters, etc. may also be individually-packaged in modules with optical fiber interconnects to achieve the same topology and functionality.

Reference throughout this specification to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment is included in at least one embodiment of the present invention. Thus, the appearances of the phrases "in one embodiment" or "in an embodiment" in various places throughout this specification are not necessarily all referring to the same embodiment. Furthermore, the particular features, structures, or characteristics may be combined in any suitable manner in one or more embodiments.

The foregoing described embodiments depict different components contained within, or connected with, different other components. It is to be understood that such depicted arrangements or architectures are merely exemplary, and that in fact many other arrangements or architectures can be implemented which achieve the same functionality. In a conceptual sense, any arrangement of components to achieve the same functionality is effectively "associated" such that the desired functionality is achieved. Hence, any two components herein combined to achieve a particular functionality can be seen as "associated with" each other such that the desired functionality is achieved, irrespective of specific structures, architectures or intermedial components. Likewise, any two components so associated can also be viewed as being "operably connected" or "operably coupled" to each other to achieve the desired functionality.

It will be understood by those within the art that, in general, terms used herein, and especially in the appended claims (e.g., bodies of the appended claims) are generally intended as "open" terms (e.g., the term "including" should be interpreted as "including but not limited to," the term "having" should be interpreted as "having at least," the term "includes" should be interpreted as "includes but is not limited to," "comprise" and variations thereof, such as, "comprises" and "comprising" are to be construed in an open, inclusive sense, that is as "including, but not limited to," etc.). It will be further understood by those within the art that if a specific number of an introduced claim recitation is intended, such an intent will be explicitly recited in the claim, and in the absence of such recitation no such intent is present. For example, as an aid to understanding, the following appended claims may contain usage of the introductory phrases "at least one" and "one or more" to introduce claim recitations. However, the use of such phrases should not be construed to imply that the introduction of a claim recitation by the indefinite articles "a" or "an" limits any particular claim containing such introduced claim recitation to inventions containing only one such recitation, even when the same claim includes the introductory phrases "one or more" or "at least one" and indefinite articles such as "a" or "an" (e.g., "a" and/or "an" should typically be interpreted to mean "at least one" or "one or more"); the same holds true for the use of definite articles used to introduce claim recitations. In addition, even if a specific number of an introduced claim recitation is explicitly recited, those skilled in the art will recognize that such recitation should typically be interpreted to mean at least the recited number (e.g., the bare recitation of "two recitations," without other modifiers, typically means at least two recitations, or two or more recitations).

**EXHIBIT 1**
**Page 22**

US 8,773,665 B1

9

Spatially relative terms such as "under", "below", "lower", "over", "upper", and the like, are used for ease of description to explain the positioning of one element relative to a second element. These terms are intended to encompass different orientations of the device in addition to different orientations than those depicted in the figures. Further, terms such as "first", "second", and the like, are also used to describe various elements, regions, sections, etc. and are also not intended to be limiting.

Without further analysis, from the foregoing others can, by applying current knowledge, readily adapt the disclosed technology for various applications. Such adaptations should and are intended to be comprehended within the meaning and range of equivalence of the following claims.

What is claimed is:
1. A compact fiber optic gyroscope comprising:
a first housing defining an interior and comprising:
   a base plate portion defining an annular cavity, and
   a top cover portion configured to be coupled to the base plate portion to define the interior of the first housing, wherein the top cover portion defines an input/output opening;
a planar optical fiber loop having a first end and a second end and at least partially secured by the annular cavity of the base plate portion, wherein the planar optical fiber loop is disposed in the first housing around the periphery of the interior of the first housing and defines an inner circumference;
a transceiver module disposed in the interior of the first housing within the inner circumference of the planar optical fiber loop, wherein the transceiver module comprises:
   a second housing;
   a non-coherent light source disposed in the second housing for producing a first beam of light;
   an optical circulator disposed in the second housing and in the path of the first beam of light to produce polarized second and third beams, with polarization orthogonal to each other;
   a focusing lens disposed in the second housing and positioned in an optical path between the non-coherent light source and the optical circulator to focus non-coherent light from the non-coherent light source to a focus point beyond the optical circulator; and
   first and second photodiodes disposed in the second housing and coupled to the optical circulator, wherein the first photodiode is a transmit monitor photodiode coupled to the second beam, and the second photodiode is a receiver photodiode;
a phase modulator mounted on the base plate portion and disposed in the interior of the first housing within the inner circumference of the planar optical fiber loop and coupled to the third beam from the transceiver module to produce fourth and fifth beams coupled to the first and the second ends, respectively, of the optical fiber loop, and receiving return sixth and seventh beams from the second and the first ends, respectively, of the fiber loop, and coupling the return sixth and seventh beams to the receiver photodiode in the transceiver module;
a processor disposed in the interior of the first housing within the inner circumference of the planar optical fiber loop and coupled to the receiver photodiode for determining a phase relationship between the return sixth and seventh beams and thereby determining the rotational rate of the planar optical fiber loop with respect to an axis; and

10

an input/output connector operatively coupled to the processor and configured to at least report inertial guidance information, wherein the external input/output connector extends through the input/output opening of the top cover portion.

2. A compact fiber optic gyroscope as defined in claim 1, wherein the first housing is cylindrically shaped having dimensions of approximately 80 mm in diameter and 20 mm in height.

3. A compact fiber optic gyroscope as defined in claim 1, wherein the weight of the gyroscope is 160 grams or less.

4. A compact fiber optic gyroscope as defined in claim 1, wherein the second housing is a hermetically sealed butterfly package.

5. A compact fiber optic gyroscope as defined in claim 1, wherein the transceiver module includes a single input/output optical fiber coupled to the optical circulator.

6. A compact fiber optic gyroscope as defined in claim 5, wherein the single input/output optical fiber terminates in a pig tail.

7. A compact fiber optic gyroscope as defined in claim 1, wherein the first housing is cylindrically shaped.

8. A compact fiber optical gyroscope as defined in claim 1, wherein the phase modulator is a lithium niobate modulator.

9. A compact fiber optic gyroscope as defined in claim 1, wherein the phase modulator has an output pair of optical fibers, one of which is spliced to the first end of the planar optical fiber loop and the other of which is spliced to the second end of the planar optical fiber loop.

10. A compact fiber optic gyroscope as defined in claim 1, wherein said optical circulator includes a polarizing beam splitter.

11. A compact fiber optic gyroscope as defined in claim 10, wherein said optical circulator further comprises a Faraday rotator coupled to an output of the polarizing beam splitter.

12. A compact fiber optic gyroscope as defined in claim 10, wherein the polarizing beam splitter directs the P polarization of the first beam of light from the light source onto the transmit monitor photodiode.

13. A compact fiber optic gyroscope as defined in claim 11, wherein the polarizing beam splitter directs the S polarization of the first beam of light from the light source through and into the Faraday rotator.

14. A compact fiber optic gyroscope as defined in claim 11, wherein the Faraday rotator changes the polarization of the S polarized return sixth and seventh beams to a P polarized eighth beam, and the polarizing beam splitter then directs the P polarized eighth beam to the receiver photodiode.

15. A compact fiber optic gyroscope as defined in claim 1, wherein the rotational rate has a drift of between 0.005 and 1.0 degrees per hour.

16. A compact fiber optic gyroscope as defined in claim 1, wherein the noise measured in angular degrees random walk per square root of hour is between 0.001 and 0.02 degrees.

17. A compact fiber optic gyroscope as defined in claim 1, wherein the length of the fiber optic loop is between 100 m and 2 km.

18. A compact fiber optic gyroscope as defined in claim 1, wherein the processor is software programmable to take into account the length of the optical fiber loop.

19. A compact fiber optic gyroscope as defined in claim 1, further comprising:
   a first printed circuit board coupled to the base plate portion;
   a second printed circuit board, wherein the processor and the input/output connector is coupled to the second printed circuit board; and

**EXHIBIT 1**
**Page 23**

US 8,773,665 B1

**11**

an inter-board electrical board connecting the first printed circuit board to the second printed circuit board.

\*   \*   \*   \*   \*

**12**

**EXHIBIT 1**

**Page 24**

# EXHIBIT 2

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| Phoenix Navigation Components, LLC, | AAA Reference No.: |
| Claimant, | **<u>HIGHLY CONFIDENTIAL</u>** |
| v. | **FIRST AMENDED DEMAND FOR ARBITRATION** |
| EMCORE Corporation, | |
| Respondent. | Locale Requested:  New York, NY |

Plaintiff Phoenix Navigation Components LLC ("Phoenix"), for its Demand for Arbitration ("Demand") against EMCORE Corporation, alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      A decade ago, EMCORE negotiated for and received the right to draw upon Phoenix's design expertise in the field of fiber optic gyroscope ("FOG") technology in order to competitively produce and market FOG products.  Because EMCORE lacked the in-house knowledge and ability to develop these highly-specialized navigational devices – typically used in drones, missiles, and other devices sold to the military – it turned to the experts at Phoenix who collectively had decades of experience in the area.  In exchange for Phoenix's services, EMCORE agreed to, among other things, (1) pay Phoenix royalties upon EMCORE's sale of FOGs incorporating Phoenix's technology, and (2) provide Phoenix with at least 25% of engineering activity on customer requests for custom FOG designs that are typically required for new customers or applications.  The parties memorialized these terms in three agreements:  a Memorandum of Understanding (the "MOU"); the EMP-1 FOG License Agreement (the "EMP-1 Agreement"); and the EMP-1k FOG License Agreement (the "EMP-1k Agreement") (collectively, the "Agreements").  True and correct copies of the Agreements are attached as

**EXHIBIT 2**
**Page 25**

*HIGHLY CONFIDENTIAL*

**Exhibits A-C**, respectively, each of which is designated highly confidential and is incorporated by reference as though fully set forth in this Demand.

2.     Since 2008, and until recently, the parties had enjoyed a productive and symbiotic relationship. EMCORE paid Phoenix over $700,000 in royalties on approximately 700 products sold by EMCORE to its customers, and awarded Phoenix over $6.6 million in engineering work under multiple EMCORE purchase orders without any complaints regarding the work product. EMCORE also requested Phoenix's technical expertise and support for numerous customer visits, presentations, and proposals, and also for generation of technical papers and presentations at Institute of Navigation conferences. Because of Phoenix's contacts, expertise, reputation in the industry, marketing support, conference participation, and development of top-grade FOGs and other devices, EMCORE won numerous contracts from the government and prime contractors, and its prominence within the defense industry grew.

3.     Now that EMCORE has made its name by using Phoenix-licensed technology, its management team, which has undergone a near-complete overhaul in recent months, no longer wants to abide by the deal EMCORE struck with Phoenix a decade ago. EMCORE is on the verge of securing the largest FOG and navigation defense contracts it has ever had, and it has set in motion a plan to oust Phoenix by running roughshod over the parties' contracts, misappropriating, using, selling, and even patenting Phoenix's technology without Phoenix's consent and without paying Phoenix royalties, and refusing to provide Phoenix with the engineering work to which it is entitled under the MOU. To execute its plan, EMCORE devised a scheme, among other things:  to withhold payment of over $90,000 in royalties that ***EMCORE has admitted are due to Phoenix***; to file a meritless lawsuit against Phoenix in California state court, notwithstanding the parties' numerous agreements to arbitrate; to improperly terminate the

**EXHIBIT 2**
**Page 26**

*HIGHLY CONFIDENTIAL*

Agreements without allowing Phoenix the mandatory 60-day period in which to cure; and to publicly disparage Phoenix's well-earned reputation and proven technical ability.

4.     EMCORE's actions since this arbitration was filed confirm its improper motive and give rise to additional claims. **First**, since Phoenix initiated this arbitration, EMCORE "rebranded" its product line in an attempt to bury the fact that it continues to sell Phoenix's licensed technology. This process exposed for the first time to Phoenix that, years ago, EMCORE patented Phoenix's proprietary, confidential, and novel FOG technology *without ever telling Phoenix*. Through this arbitration, Phoenix seeks to correct inventorship for this patent, which claims technology independently developed by individuals at Phoenix and provided to EMCORE. **Second**, EMCORE voluntarily dismissed its jurisdictionally and substantively improper California lawsuit, but not until it forced Phoenix to incur significant legal fees to move to transfer that case in order to compel arbitration, and to stay or dismiss. These fees are recoverable and due to Phoenix under the Agreements. **Third**, recognizing it had breached the Agreements by purporting to terminate them for material breach without providing Phoenix any notice or opportunity to cure, on July 16, 2018, EMCORE allegedly re-noticed its termination, this time "for convenience." In doing so, EMCORE committed several more breaches of the Agreements, by failing to provide Phoenix with the requisite notice and royalty reports, and because it continues to sell Phoenix's technology. **Fourth,** EMCORE breached the Agreements by missing yet another quarterly royalty payment due to Phoenix on July 31, 2018.

5.     The above shows that EMCORE believes that it can, with impunity, engage in conduct prohibited by the Agreements while purporting to retain the right to sell Phoenix-developed technology, but without paying contractually-required royalties. EMCORE's unilateral and blatant attempt to misappropriate Phoenix's technology and to use illegitimate

**EXHIBIT 2**
**Page 27**

tactics to force Phoenix into submission violates Phoenix's rights, breaches EMCORE's obligations under the Agreements, and is in consummate bad faith.

6.      Phoenix brings this action to recover for damages it has suffered as a direct and proximate result of EMCORE's unlawful, illegal, and improper acts, including its numerous, material, bad faith, repeated, and ongoing breaches of the Agreements.  Phoenix also seeks declaratory relief that the Agreements remain in full force and effect, that the non-competition provision of the MOU is voided by EMCORE's conduct, and that the Arbitrator correct inventorship on Patent No. 8,773,665 by finding that Phoenix employees Glenn Gage and Robert Hansen, and not EMCORE employees Mr. Ronald T. Logan, Jr. and Ka Kha Wong, are the true inventors of the technology claimed in the patent.  Finally, Phoenix seeks injunctive relief that EMCORE be enjoined from selling Phoenix's technology without paying the required royalties to Phoenix, and that it be compelled to offer Phoenix, at a minimum, 25% of engineering work per the MOU.

## PARTIES

7.      Plaintiff Phoenix Navigation Components LLC is a nine-employee Massachusetts limited liability company with a principal place of business in Walpole, Massachusetts.  Phoenix is comprised of industry-leading experts engaged in the design and building of FOGs and FOG prototypes.  Phoenix was formed in June 2008 by a core group of key engineers from Northrop Grumman Corporation's ("NGC") Navigation Systems Division in Massachusetts following the facility's relocation to California.  Phoenix's engineers have, collectively, many decades of experience in the FOG industry.

8.      Defendant EMCORE Corporation is a New Jersey corporation with a principal place of business in Alhambra, California.  EMCORE's stock is publicly traded under NASDAQ ticker EMKR.  In fiscal year 2017, EMCORE had over $122 million in revenue.  For nearly a

**EXHIBIT 2**
**Page 28**

*HIGHLY CONFIDENTIAL*

decade, EMCORE manufactured and sold FOGs designed and developed by Phoenix and continues to do so.

## ARBITRATION AGREEMENT

9.      Each of the Agreements require the parties to arbitrate their disputes in New York City, New York, "under the rules and regulations of the American Arbitration Association."

10.     The MOU's arbitration clause states in its entirety:

**13      GOVERNING LAW/JURISDICTION**
All disputes under this Agreement that cannot be resolved by the parties shall be submitted to arbitration in New York City, NY, under the rules and regulations of the American Arbitration Association. Either party may invoke this paragraph after providing 30 days written notice to the other party. The prevailing party in any litigation or arbitration commenced to enforce or construe the terms of this Agreement shall be entitled to collect from the other party its actual litigation costs, including reasonable attorneys' fees. All costs of arbitration shall be divided equally between the parties. Any award may be enforced by a court of law. This Agreement shall be governed by the laws of the State of New York.

11.     The EMP-1 Agreement's arbitration clause states in its entirety:

**11      ARBITRATION.**

All disputes under this Agreement that cannot be resolved by the parties shall be submitted to arbitration in New York City, NY, under the rules and regulations of the American Arbitration Association. Either party may invoke this paragraph after providing 30 days written notice to the other party. The prevailing party in any litigation or arbitration commenced to enforce or construe the terms of this Agreement shall be entitled to collect from the other party its actual litigation costs, including reasonable attorneys' fees. All costs of arbitration shall be divided equally between the parties. Any award may be enforced by a court of law.[1]

12.     The EMP-1k Agreement's arbitration clause states in its entirety:

_____

[1] Section 22 of the EMP-1 Agreement further states that "[t]his Agreement shall be governed by the laws of the State of New York."

**EXHIBIT 2**
**Page 29**

*HIGHLY CONFIDENTIAL*

8      **ARBITRATION.**

All disputes under this Agreement that cannot be resolved by the parties shall be submitted to arbitration in New York City, NY, under the rules and regulations of the American Arbitration Association.    Either party may invoke this paragraph after providing 30 days written notice to the other party.  The prevailing party in any litigation or arbitration commenced to enforce or construe the terms of this Agreement shall be entitled to collect from the other party its actual litigation costs, including reasonable attorneys' fees.  All costs of arbitration shall be divided equally between the parties.  Any award may be enforced by a court of law.[2]

13.    Because EMCORE purported to terminate the Agreements on May 10, 2018, Phoenix is excused from the 30-day requirement to provide written notice before commencing arbitration.

## FACTUAL BACKGROUND

*EMCORE and Phoenix Enter into the MOU Because EMCORE Lacks the In-House Capability to Design and Develop FOGs*

14.    In December 2006, at a meeting at NGC's Massachusetts facility, EMCORE learned that the NGC facility would be closing and that key engineers would be forming Phoenix.  In or about April 2008, EMCORE sought out and approached a Phoenix member and indicated that it had a potential client interested in acquiring a FOG.

15.    Shortly thereafter, EMCORE and Phoenix entered into a Non-Disclosure Agreement ("NDA"), dated June 24, 2008, in order to "develop[] a [FOG] that will be manufactured and sold by EMCORE under a separately negotiated license agreement between EMCORE and [Phoenix]."[3]  Following execution of the NDA, Phoenix designed a custom FOG

---

[2] Section 20 of the EMP-1k Agreement further states that "[t]his Agreement shall be governed by the laws of the State of New York."

[3] The NDA is attached hereto as Exhibit A to the MOU.  The NDA establishes a duty of care requiring EMCORE to "preserve in confidence" all proprietary information Phoenix may provide it and to exercise "at least the same

**EXHIBIT 2**

**Page 30**

product, which was named the EMP-1. EMCORE reviewed and became satisfied with the design.

16.   Between late-June 2008 and December 29, 2008, the date of the EMP-1 Agreement, EMCORE conducted due diligence on Phoenix, and thoroughly scrutinized and became satisfied with Phoenix's business, know-how, technical capabilities, and intellectual property. EMCORE's in-house counsel at the time and Dr. KK Wong, EMCORE's Manager, Specialty Products, were former employees of NGC's Navigation Systems Division; they were fully familiar with FOG and IMU technologies and capable of assessing their origins and viability. NGC was previously a leading supplier of FOG technology.

17.   On December 29, 2008, seven months after EMCORE began to scrutinize Phoenix's business and technical expertise, the parties entered into the MOU, through which the parties proclaimed that the "overall objective of the parties' relationship is to initially combine the [FOG] and Inertial Measurement Unit (IMU) design capability of Phoenix with the fiber optic component design and assembly capability of EMCORE in order for EMCORE to competitively produce and market FOGs." MOU § 1. The parties further agreed to "jointly develop and build EMP-1 FOG prototypes," and that "with a concerted effort by Phoenix and EMCORE . . . the first Prototype FOG [would] be operational by January 31, 2009." MOU § 2.1. In fact, the parties met this goal.

18.   Notably, it was "assumed that the FOG electronics and mechanical design may require significant revision to satisfy particular customer requirements." *Id.* at § 2.2.

---

degree of care used to restrict disclosure and use of [EMCORE's] own confidential and proprietary information." NDA at § 4 (further requiring EMCORE to receive written permission from Phoenix to disclose its information to any third party). As explained herein, EMCORE breached the MOU, including the NDA, and its duty of care by misappropriating and disclosing Phoenix's confidential and proprietary information to third-parties without Phoenix's consent.

7

**EXHIBIT 2**
**Page 31**

*HiGHLY CONFIDENTIAL*

19.     EMCORE agreed in the MOU to share with Phoenix certain customer requests for custom FOG and IMU designs: "Any such [customer request for custom FOG designs] to Phoenix, or EMCORE will be shared with the other company . . . . [I]f the customer is paying for non-recurring engineering expenses, . . . , it is intended that Phoenix be responsible for not less than 25% of the engineering activity determined by the proposed hours exclusive of production." MOU §§ 2.4, 2.5.

20.     Although the MOU required EMCORE to give only 25% of that engineering activity to Phoenix, because EMCORE did not have the in-house expertise to perform the remaining 75%, Phoenix often received upwards of 50% or more of the activity on these projects.  These activities were governed by the terms of the MOU.

21.     Since 2008, EMCORE has issued to Phoenix nearly 50 purchase orders – totaling over $6.6 million – for engineering work.   A portion of this engineering work related to customizing designs for customer applications, while the remainder related to, among other things, participating in design reviews and building and testing prototype units that used Phoenix-licensed technology or derivatives of that technology.  The purchase orders did not include performance specifications, statements of work, detailed requirements or any list of deliverable data items regarding the tasks to be performed by Phoenix. The work product from each and every purchase order was reviewed and approved for payment by EMCORE's engineering department.

22.     The volume, scope, and dollar amount of the purchase orders is directly attributable to the fact that EMCORE lacked an adequate in-house ability to perform customer support, design, and development testing on its deliverable prototype units.   Indeed, the electronics for a FOG embody extreme precision and consist of at least eight unique functions,

**EXHIBIT 2**
**Page 32**

*H₁GHLY CONFIDENTIAL*

the majority of which EMCORE had no ability to perform on its own, and which it continues to lack the ability to do.  Those functions include, but are not limited to:

1. FOG Detector Processing;.
2. Phase rebalance servo, DSP-based;
3. Phase rebalance servo, FPGA-based;
4. Integrated Optical Circuit Drive;
5. Gain Control Servo;
6. FOG Light Source Servo;
7. Light Source Temperature Control Servo; and
8. Light Source Temperature Compensation Algorithms.

23.     Phoenix added substantial value to EMCORE because it essentially served as its on-call FOG business development, engineering, and product development department.  Among other things:

- Phoenix drafted the original systems design concepts briefed and proposed by EMCORE to its potential customers;

- Upon EMCORE's receipt of a contract, Phoenix customized its licensed technology to satisfy EMCORE's customers' requirements and then drafted the material to be used in Preliminary, Final Design Reviews, and Technical Interchange Meetings;

- Phoenix provided to EMCORE detailed mechanical drawings for each customized part and circuit schematics customized for the circuit boards necessary to meet the mechanical requirements provided by EMCORE's customers;

- Phoenix then built and tested prototype units for these custom applications and tested them over a range of environments to simulate a particular customer's application;

- Phoenix provided EMCORE's production personnel with draft assembly plans and procedures and trained EMCORE's assembly workers; and

- Phoenix further provided acceptance test plans, procedures, and data reduction algorithms for FOGs.

24.     Since at least 2008, EMCORE has failed to properly staff and maintain a functioning team of FOG engineers, and has failed entirely to hire a professional mechanical

**EXHIBIT 2**
**Page 33**

*H*₁*GHLY CONFIDENTIAL*

design engineer. Even when EMCORE did hire FOG engineers, they had no FOG experience when they were hired and were soon terminated, laid off, or reassigned by EMCORE. Phoenix knows that these engineers had no practical FOG experience because Phoenix trained and coached them. Indeed, because of this training, the amount of time, effort, and resources Phoenix expended went well beyond anything envisioned by the parties at the time they executed the Agreements.

25.     Notwithstanding EMCORE's lack of institutional ability to design, develop, and test a FOG or IMU, EMCORE has begun to tout Phoenix's support as its own. For example, just seven days before improperly terminating the Agreements, in a May 3, 2018 press release announcing a new contract with one of EMCORE's "most important customers," EMCORE's Vice President and General Manager of Aerospace & Defense stated that "EMCORE demonstrated the versatility to configure its IMU technology to be distributed within the customer's tight volume and space constraints, which was integral to being selected for this program." However, Phoenix produced mechanical designs of all the FOG and IMU products listed on EMCORE's website, including the product referenced in the press release, with the exception of the Hawkeye™ FOG, discussed further below, which appears to have been derived or modified from Phoenix-licensed technology.

26.     Knowing that it lacked the ability to design, develop, and test a FOG of its own, EMCORE nevertheless assumed various responsibilities pursuant to the MOU. For example, EMCORE agreed to provide "circuit card layout and routing," and to procure "or manufacture . . . all materials for the prototypes," including Integrated Optical Circuits ("IOCs"). MOU § 4.2. However, EMCORE could not fulfill even this limited obligation and repeatedly failed to provide fully functional IOCs. Phoenix expended substantial resources identifying the major

**EXHIBIT 2**
**Page 34**

*HIGHLY CONFIDENTIAL*

deficiencies in EMCORE's IOCs, and proposing how to screen out defective units prior to incorporating them into FOGs.

27.    To induce Phoenix into entering into the MOU, EMCORE also made certain other representations, including that it would loan to Phoenix equipment necessary to develop, debug, and evaluate FOGs. *Id.* at § 4.2.4. That equipment included, but is not limited to: standard electronics laboratory equipment; a thermal chamber; and a single axis rate table. In fact, EMCORE only provided minimal, old, obsolete equipment, and never provided Phoenix with a single axis motion table. EMCORE nevertheless acquired a used single axis motion table for its own use, but it is not suitable for volume batch production and has failed multiple times. Phoenix raised issues with EMCORE about its failure to provide proper equipment, and EMCORE responded that the necessary equipment was not in EMCORE's budget. Because EMCORE failed to provide the requisite equipment to Phoenix, Phoenix was required to procure the equipment on its own, and at great expense. That equipment included, but is not limited to: oscilloscopes; spectrum analyzers; power supplies; data acquisition devices; thermal chambers; two rate tables; positioning tables; fiber splicers; microscopes; solder station; an autocollimator; and a nano ammeter that it has loaned to EMCORE, since it was critically needed but not in EMCORE's budget. EMCORE is still in possession of the nano ammeter.

28.    Critically, in exchange for EMCORE's promises in the MOU, Phoenix agreed to "deal exclusively with EMCORE with respect to FOGs, FOG based IMUs, and related FOG based navigational product developments." *Id.* at § 11. "As an inducement for EMCORE to enter into [the] MOU and the License Agreement and as additional consideration for the consideration to be paid to Phoenix," Phoenix and its then-members also agreed that "[d]uring the term of [the] MOU and for a period of two (2) years after the termination of the License

**EXHIBIT 2**
**Page 35**

*HIGHLY CONFIDENTIAL*

Agreement" they would not, among other things, "be employed by, or render services or advice or other aid to, any person or entity engaged in or planning to become engaged in a business that offers or is affiliated with a business that offers FOGs and/or FOG Based IMUs . . . ." *Id.*

29.     The MOU also set forth termination procedures. Specifically, the MOU: "*may* be terminated by either party upon termination of the License Agreement between Phoenix, LLC and EMCORE." *Id.* at § 7 (emphasis added). Because EMCORE has not properly terminated the MOU, it remains in effect and EMCORE is in breach for failing to provide engineering activity and equipment to Phoenix as explained herein.

30.     Finally, the MOU contemplated that the parties would enter into subsequent agreements for EMCORE to license Phoenix's technology. In particular, EMCORE agreed that, "[u]nder a separate agreement, Phoenix will provide EMCORE a license for EMCORE to manufacture and sell EMP-1 FOGs." *Id.* at § 3.2. These agreements are discussed below.

31.     Phoenix performed each of and dutifully abided by its obligations under the MOU.

**EMCORE Agrees to Pay Phoenix Royalties on Phoenix-Developed FOGs and Derivatives in the EMP-1 Agreement**

32.     Following EMCORE's months-long review of Phoenix's intellectual property and EMP-1 prototype design, on December 29, 2008, the parties entered into the EMP-1 Agreement, whereby EMCORE agreed that "Phoenix owns [FOG] technology embodied in the EMP-1 FOG" described in the attachments thereto. EMP-1 Agreement § 2. EMCORE also acknowledged that "Phoenix owns or has in its possession certain technical information and know how relating to, without limitation, the specification, evaluation, simulation, design, implementation, assembly, manufacture, procurement of components or subsystems from suppliers or subcontractors,

**EXHIBIT 2**
**Page 36**

*HIGHLY CONFIDENTIAL*

configuration management, quality control, testing, application engineering, customization, installation and service of FOG products ('Trade Secrets')." *Id.* at §13.

33.     Pursuant to the EMP-1 Agreement, Phoenix granted EMCORE a license "to make, . . . . use, sell, offer for sale, lease, import and export, subject to US export laws, EMP-1 FOG and EMP-1 Derivative products, whether stand-alone or incorporated into a larger product (e.g., Inertial Measurement Units), . . . ." *Id.*

34.     In exchange for the license, EMCORE agreed to pay Phoenix a royalty, including:

> An initial royalty payment of $100,000 ***upon completion by EMCORE of an operating EMP-1 FOG prototype***, as reasonably deemed by EMCORE, followed by a second royalty payment of $50,000 upon the commercial sale . . . and receipt of payment for of [sic] the first single axis FOG . . . and a royalty of 7.5% of the sale price . . . of all FOGs and EMP-1 derivatives sold by EMCORE up to total royalty payments equal to [$1,000,000].

*Id.* at § 3 (emphasis added).  Upon completion of an operating EMP-1 FOG prototype, EMCORE paid Phoenix the initial $100,000.  And upon the commercial sale of the EMP-1 FOG, EMCORE paid Phoenix the second royalty payment of $50,000.[4]

35.     EMCORE also agreed to pay Phoenix royalties on derivatives, modifications, and improvements to Phoenix's EMP-1 FOG Technology.  Specifically, EMCORE agreed:

> Any change, improvement, derivative or modification made to or from the EMP-1 FOG Technology by Phoenix is included under this license.  Any derivatives or improvements of the EMP-1 FOG Technology developed independently by EMCORE or fully funded by EMCORE and developed by Phoenix shall be the exclusive property of EMCORE. ***Such derivatives or improvements to the EMP-1 FOG Technology do not transfer ownership of Phoenix provided technology to EMCORE or relieve EMCORE of its requirement and duty to pay royalties on EMP-1 FOGs or***

---

[4] That EMCORE made these payments proves Phoenix's EMP-1 Technology was viable and belies EMCORE's allegations in its now-dismissed California complaint that (1) Phoenix could not develop that technology, and (2) Phoenix "induced" EMCORE into entering into the License Agreements with representations regarding Phoenix's technical expertise, which Phoenix plainly possessed.

**EXHIBIT 2**

**Page 37**

*HIGHLY CONFIDENTIAL*

> **derivatives that may contain the modifications or improvements
> to the EMP-1 FOG Technology solely owned by Phoenix.**
> Subject to the terms of this Agreement, ***all EMP-1 FOG
> Technology, derivatives and improvements, developed solely by
> Phoenix, prior to or following the Effective Date, shall be the
> sole property of Phoenix.***

EMP-1 Agreement § 7 (emphasis added).

36.     Notably, Phoenix did not warrant any of the technology provided under the

license, which EMCORE accepted "AS IS." *Id.* at § 12

37.     With respect to termination, the EMP-1 Agreement requires EMCORE to provide

120 days' written notice to Phoenix, but:

> in the case of a material breach of this Agreement by either party,
> the other party shall have the right to terminate any or all of the
> rights and licenses granted to that party . . . by giving the other
> party sixty (60) days['] written notice of its intention to terminate
> any or all of such rights and license, without limitation of any other
> right the terminating party may have on account of such breach
> under this Agreement.

EMP-1 Agreement § 16.  However, "if the breaching party shall remedy such failure within such

sixty (60) day period . . . then such rights and licenses specified in the notice ***shall not be

terminated*** on the date specified in such notice." *Id.*  EMCORE further agreed that, "after any

termination of this Agreement, EMCORE shall render an accounting for all royalty bearing

products sold pursuant to this Agreement from the last such report to the termination date." *Id.*

38.     Finally, the EMP-1 Agreement contained a royalty buyout provision, allowing

EMCORE "the right to buy-out Phoenix's right to receive the royalty payments for the EMP-1

FOG Technology . . . ." *Id.* at § 6.  The buy-out provision worked as follows:

> The buy-out price during the period prior to Phoenix receiving One
> Million Dollars ($1,000,000) of royalty payments will be
> $1,250,000 less the Initial Royalty Payments and less the 7.5%
> royalties paid to date by EMCORE.  The buy-out price at any time
> following Phoenix receiving One Million Dollars ($1,000,000) of

**EXHIBIT 2**

**Page 38**

*HIGHLY CONFIDENTIAL*

> royalty payments from EMCORE will be $250,000. Following a buy-out in accordance with this paragraph, EMCORE shall be the sole owner of the EMP-1 FOG and Phoenix irrevocably assigns to EMCORE the right of use, sell, offer for sale, lease EMP-1 FOG Technology and all applicable intellectual property rights related to the EMP-1 FOG Technology, including any improvements or derivatives.

*Id.* Because Phoenix has not received $1,000,000 of royalty payments from EMCORE, the buy-out price is $1,000,000 less $150,000 in Initial Royalty Payments, less the royalties paid to date.

39.     By terminating the License Agreements, EMCORE circumvented the buy-out provision and usurped Phoenix's technology.

40.     Phoenix performed each of its obligations under the EMP-1 Agreement, or was otherwise excused from doing so.

**EMCORE Agrees to Pay Phoenix Additional Royalties on Phoenix-Developed FOGs and Derivatives in the EMP-1k Agreement**

41.     As the parties' relationship grew closer and their interaction more frequent, EMCORE customers began to request higher accuracy FOGs than those covered by the EMP-1 License Agreement, as well as complex inertial measurement units ("IMUs") and other navigation systems that contain three FOGs. Indeed, the MOU anticipated this would be the case. MOU § 3.2 ("Additional" follow-on opportunities will be addressed under new license agreements or expansion of the products covered under existing agreements."). Accordingly, on May 25, 2011, the parties entered into the EMP-1k Agreement to govern these higher accuracy FOGs and complex IMUs and navigation systems.[5]

---

[5] That EMCORE would enter into yet another license agreement with Phoenix almost three years after entering into the first set of agreements demonstrates that EMCORE's claims in its now-dismissed California lawsuit that Phoenix fraudulently induced it to enter into the Agreements are spurious and mere pretext for improperly terminating the Agreements.

**EXHIBIT 2**

**Page 39**

*HιGHLY CONFIDENTIAL*

42.    In the EMP-1k Agreement, EMCORE again acknowledged, "Phoenix owns [FOG] technology embodied in the EMP-1 FOG" Agreement.   EMP-1k Agreement § 2. EMCORE also acknowledged that "Phoenix owns or has in its possession certain technical information and know how relating to, without limitation, the specification, evaluation, simulation, design, implementation, assembly, manufacture, procurement of components or subsystems from suppliers or subcontractors, configuration management, quality control, testing, application engineering, customization, installation and service of FOG products ('Trade Secrets')." *Id.* at   § 11.

43.    Pursuant to the EMP-1k Agreement, Phoenix granted EMCORE a further license to "use, sell, offer for sale, lease, import and export, subject to US export laws, EMP-1k FOG and EMP-1k Derivative products, whether stand-alone or incorporated into a larger product (e.g., IMUs), . . . ." *Id.* at § 2.

44.    In return, EMCORE agreed:

> [to] pay to Phoenix a royalty of 7.5% of the sale price . . . of all EMP-1k FOGs and EMP-1k Derivatives sold by EMCORE.  The royalty shall be paid within one month of completion of a calendar quarter (3-month period) and include all paid for sales of that quarter.  With each royalty payment, EMCORE will submit to Phoenix a written report that sets forth the calculation of the amount of the royalty payment.  . . .

*Id.* at § 3.

45.    EMCORE once again agreed to pay Phoenix royalties on derivatives, modifications, or improvements to Phoenix's EMP-1k Technology:

> Any change, Improvement, derivative or modification made to or from the EMP-1k FOG by Phoenix is included under this license. Any derivatives or improvements of the EMP-1k FOG Technology developed independently by EMCORE or fully funded by EMCORE and developed by Phoenix shall be the exclusive property of EMCORE.  ***Such derivatives or improvements to the***

16

**EXHIBIT 2**
**Page 40**

*HIGHLY CONFIDENTIAL*

> **EMP-1k FOG Technology do not transfer ownership of Phoenix provided technology to EMCORE or relieve EMCORE of its requirement and duty to pay royalties on EMP-1k FOGs or derivatives that may contain the modifications or improvements to the EMP-1k FOG Technology solely owned by Phoenix.** Subject to the terms of this Agreement, **all EMP-1 FOG Technology, derivatives and improvements, developed solely by Phoenix, prior to or following the Effective Date, shall be the sole property of Phoenix.**

EMP-1 Agreement § 7 (emphasis added).[6]

46.    Phoenix did not warrant any of the technology provided under the license, which EMCORE accepted "AS IS." *Id.* at § 10.

47.    Like the EMP-1 Agreement, the EMP-1k Agreement requires EMCORE to provide 120 days' written notice to Phoenix to terminate, but:

> In the case of a material breach of this Agreement by either party, the other party shall have the right to terminate any or all of the rights and licenses granted to that party . . . by giving the other party sixty (60) days['] written notice of its intention to terminate any or all of such rights and license, without limitation of any other right the terminating party may have on account of such breach under this Agreement.

EMP-1 Agreement § 16.  However, "if the breaching party shall remedy such failure within such sixty (60) day period . . . then such rights and licenses specified in the notice ***shall not be terminated*** on the date specified in such notice." *Id.* (emphasis added).  EMCORE again agreed that, "[a]fter any termination of this Agreement, EMCORE shall render an accounting for all royalty bearing products sold pursuant to this Agreement from the last such report to the termination date." *Id.*

---

[6] Each of the Agreements were heavily-negotiated between the parties.  Indeed, the parties devoted substantial and particular attention to, among other things, the "Follow-on" engineering provisions (§§ 2.4 and 2.5) in the MOU, the royalty terms in the EMP-1 and EMP-1k Agreements (§ 3 of the License Agreements), and the "Technology Modifications" provisions (§ 7 of the License Agreements), which require EMCORE's continued payment of royalties to Phoenix on any derivatives of, or modifications or improvements to, Phoenix's technology.

**EXHIBIT 2**
**Page 41**

*HiGHLY CONFIDENTIAL*

48.     Like the EMP-1 Agreement, the EMP-1k Agreement allowed EMCORE "the

right to buy-out Phoenix's right to receive the royalty payments for the EMP-1k FOG. . . ." *Id.* at

§ 6. The buy-out provision worked as follows:

> The buy-out price is two and a half Million Dollars ($2,500,000).
> Following a buy-out in accordance with this paragraph, EMCORE
> shall be the sole owner of the EMP-1k FOG Technology, including
> any related PHOENIX PATENTS, and Phoenix shall irrevocably
> assign to EMCORE the right to use, sell, offer for sale, lease and
> /or license the EMP-1k FOG Technology and all intellectual
> property rights thereto and any Improvements or derivatives.

*Id.*

49.     Notably, in November 2017, EMCORE Vice President Dave Faulkner

approached Phoenix about buying-out the royalties under the License Agreements.  Although

Phoenix was not interested in ending the License Agreements, Phoenix nevertheless provided

EMCORE with three potential options in the context of an informal, unapproved offer.  First,

Phoenix proposed that EMCORE and Phoenix continue their relationship as is.  It had been

productive and lucrative for both parties for nearly a decade, and Phoenix saw no reason to alter

the relationship.  Second, Phoenix proposed that EMCORE pay the buy-out calculation required

by the License Agreements.  Third, Phoenix proposed that EMCORE purchase Phoenix outright,

inclusive of the licenses and other equipment.   Several months passed with no substantive

response to Phoenix's proposal.  Instead, EMCORE's response came on May 10, 2018, in the

way of an improper, ineffective termination of the License Agreements.  EMCORE's course of

dealing underscores the plain fact that its purported termination is mere subterfuge for

EMCORE's misappropriation of Phoenix's technology without paying the required royalties.

50.     By terminating the EMP-1k Agreement, EMCORE circumvented the buy-out

provision and usurped Phoenix's technology.

**EXHIBIT 2**
**Page 42**

*HIGHLY CONFIDENTIAL*

51.     Phoenix performed each of its obligations under the EMP-1k Agreement or was otherwise excused from doing so.

***EMCORE Breaches the Agreements by Failing to Pay Phoenix Substantial Royalties or Provide NRE Funding, Improperly Terminating the Agreements without Notice, Warning, or Opportunity to Cure, and Bringing Suit in California***

52.     On March 16, 2018, a Senior Accountant with EMCORE confirmed that EMCORE had "accrued ~$90K as of February 28, 2018" in royalties due to Phoenix.  Per the relevant sections of the License Agreements, EMCORE was obligated to remit these royalty payments to Phoenix "within one month of completion of a calendar quarter" (i.e. April 30, 2018), along with a "written report that sets forth the calculation of the amount of the royalty payment." EMP-1 Agreement § 3; EMP-1k Agreement § 3.

53.     EMCORE breached the License Agreements by failing to provide the required royalty payment and report on or before April 30, 2018.

54.     While in breach of the License Agreements, on May 10, 2018, and without notice or warning, EMCORE abruptly terminated those agreements, citing entirely pretextual bases that EMCORE knew to be false.  For example, EMCORE argued, among other things, that "Phoenix still has not provided any technology package under the EMP-1k Agreement despite EMCORE's repeated requests."  EMCORE knew this was false.  Indeed, as recently as April 2018, Phoenix had responded to EMCORE's requests and provided the requested technology – for the second time.  EMCORE had lost it the first time Phoenix provided it.

55.     Curiously, EMCORE also argued that it "has not yet been able to develop viable EMP-1k FOG products using technology licensed by Phoenix under the EMP-1k Agreement."  This statement is as perplexing as it is incorrect, since a review of EMCORE's previously provided royalty summaries indicates EMCORE paid Phoenix royalties for at least 350 products

**EXHIBIT 2**
**Page 43**

*HIGHLY CONFIDENTIAL*

under the EMP-1k license through 2017.  The following table shows the number of EMP-1 and EMP-1k FOG products that EMCORE has sold (as disclosed to Phoenix by EMCORE):

| Product/Model | Approximate Number of Units Known to Have Been Sold by EMCORE |
|---|---|
| **EMP-1 LICENSED FOG PRODUCTS** | |
| EMP-1 | 350 |
| **EMP-1k LICENSED FOG PRODUCTS** | |
| EMP-1.2K | >50 |
| EMP-1.3K | 10 |
| EMP-4/MTSb | 300 |
| EMP-7 | 12 |
| AVAM | 6 |
| PAVAM | 10 |
| MiNav 1&2 | 6 |
| EIMU/300, EN-300 | 10 (contracted) |

56.     EMCORE's improper termination of the License Agreements is also a breach of those agreements.  Indeed, among other things, EMCORE failed to provide Phoenix with the requisite sixty (60) days' written notice of its intention to terminate and corresponding "Sixty Day Period" in which to cure.  *See* EMP-1 Agreement § 16; EMP-1k Agreement §14.

57.     Moreover, on the same day as its purported termination, EMCORE initiated litigation in California Superior Court alleging Phoenix materially breached the License Agreements.  In doing so, however, EMCORE breached the License Agreements, which mandate arbitration for all disputes arising under the agreement. *See* EMP-1 Agreement § 11; EMP-1k Agreement § 8.  After EMCORE refused to withdraw or dismiss its lawsuit, notwithstanding several requests from Phoenix's counsel to do so over a nearly two-month period, Phoenix was forced to incur substantial costs defending the action, including those incurred in filing a motion to dismiss, or alternatively, to transfer the case to the Southern

**EXHIBIT 2**

**Page 44**

*HIGHLY CONFIDENTIAL*

District of New York (the "Motion"), the only court with the authority to enforce the parties' bargained for agreement to arbitrate their disputes.

58.     On the due date of EMCORE's response to Phoenix's Motion, EMCORE voluntarily dismissed its meritless suit, thus acknowledging the frivolous nature of its claims and its lack of any right to bring suit in California.  Under the terms of the License Agreements, EMCORE's voluntary dismissal renders Phoenix the "prevailing party," entitling it to collect from EMCORE "its actual litigation costs, including reasonable attorneys' fees."  EMP-1 Agreement § 11; EMP-1k Agreement § 8.

59.     On the day it voluntarily dismissed its complaint in the California litigation, EMCORE also purported to re-notice its termination of the Agreements, this time "for convenience."  But EMCORE failed to satisfy the requirements in the License Agreements to terminate "for convenience."  Those requirements include providing 120 days' written notice to Phoenix, terminating its sale of any "licensed FOG products," and providing a final written royalty report.  *See* EMP-1 Agreement § 16; EMP-1k Agreement § 14.  The latter two requirements must occur within 60 days of the purported termination, which EMCORE traces back to May 10, 2018, and thus by July 9, 2018.  As EMCORE had failed to (1) provide 120 days' written notice, (2) stop selling licensed FOG products, and (3) provide a written final royalty report, EMCORE's termination "for convenience" is ineffective and itself a breach of the parties' Agreements.

60.     EMCORE committed an additional breach of the License Agreements when, on July 31, 2018, it failed to pay Phoenix royalties due on second quarter 2018 sales or to provide Phoenix with a royalty report for those sales.  *See* EMP-1 Agreement § 3; EMP-1k Agreement § 3.

**EXHIBIT 2**
**Page 45**

*HIGHLY CONFIDENTIAL*

***EMCORE Breaches the Agreements by Failing to Offer Phoenix Engineering Activity Under the MOU and Misappropriating Phoenix's Technology, and Admits its Breaches on a February 6, 2018 Call with Investors***

61.     On February 6, 2018, EMCORE announced its new Hawkeye™ series of precision, single-axis FOG modules.  EMCORE's press release describes the "EMCORE-Hawkeye™ EG-120 FOG module [as a] ultra-compact, state-of-the-art design that is the smallest, most affordable closed-loop FOG available on the market today."  That same day, during a call with investors, EMCORE's CEO Jeff Rittichier announced that EMCORE was "on track to ship production quantities of [Hawkeye™ FOGs] to a tier 1 defense prime this quarter."  Mr. Rittichier also reminded investors that "given the long design, qualification and product lifetimes in this business, it is useful to think of each program as a layer over a technical foundation."

62.     Phoenix has acted as EMCORE's primary supplier of FOGs for the past decade, during which EMCORE lacked the in-house capability to build a highly-precise FOG.  Indeed, Phoenix built the "technical foundation" that Mr. Rittichier references above.  Because EMCORE lacked the ability to develop a FOG in-house and without reliance on Phoenix technology, EMCORE could not have developed the Hawkeye™ technology without modifying or improving upon Phoenix's technology, or otherwise deriving from it.  Although Phoenix has not been provided details of the Hawkeye™ technology, from EMCORE's website it tracks a presentation developed by Phoenix and briefed to a major defense contractor, and also appears to be based on EMP-1 electronics modified to use a Field Programmable Gate Array.  Phoenix not only developed the EMP-1 technology, but also developed the Field Programmable Gate Array at its own cost and incorporated it into the PAVAM, MiNav and EN-300 products that EMCORE

22

**EXHIBIT 2**
**Page 46**

*HiGHLY CONFIDENTIAL*

also continues to sell. Nevertheless, EMCORE has not paid Phoenix a single royalty on Hawkeye™ FOGs.

63.     On the February 6 investor call, Mr. Rittichier also stated plainly that EMCORE doesn't "develop a new navigation product unless we've got a lead customer and a purchase order." Mr. Rittichier thus admitted that EMCORE had received a customer request for a custom FOG product. EMCORE had an obligation to provide Phoenix with "not less than 25% of the engineering activity" for that product, but EMCORE failed to involve Phoenix in the development of the Hawkeye™ FOGs, to pay Phoenix the required NREs, or even to inform Phoenix of the opportunity.

64.     Also on the February 6, 2018 call, Mr. Rittichier referenced EMCORE's "signed one-year sole source agreement for the MTSB program." The MTSB incorporates Phoenix technology, and EMCORE has paid Phoenix a royalty on sales of approximately 300 MTSB units in the past. Mr. Rittichier added that "[w]e have excellent visibility for the rest of the year on that product, while we work through the details of the four year contract," and confirmed that "there have been no items of contention in the discussion that stand in the way of finishing the agreement." Mr. Rittichier thus confirmed EMCORE's intention to continue to sell Phoenix-developed products, for at least 4 more years without paying any royalties to Phoenix.

65.     Mr. Rittichier also announced that EMCORE has "been negotiating a contract award to deliver the first prototypes of an advanced airborne IMU platform, *which we will deliver in the current fiscal year.* This should ultimately become *the multi-year eight figure program I spoke of last quarter.*" (emphasis added). As noted above, EMCORE lacks the in-house capability to develop a highly-precise FOG on its own and, for a decade, has relied on Phoenix's expertise and on Phoenix's licensed technology. That EMCORE is moving

**EXHIBIT 2**
**Page 47**

*HIGHLY CONFIDENTIAL*

aggressively into the navigation space and signing a "multi-year eight figure" deal at the same time it purported to terminate the Agreements confirms that EMCORE terminated the Agreements and ousted Phoenix to avoid paying royalties and to keep more of its profits for itself, all while continuing to use Phoenix's technology.   Indeed, Mr. Rittichier informed investors that they "should expect several additional announcements for advanced navigation products" over the next few months.

***EMCORE Admits Further Breaches on a May 3, 2018 Call with Investors and in a May 3, 2018 Press Release***

66.     On a May 3, 2018 earnings call, Mr. Rittichier again confirmed that EMCORE's "business development funnel has never been stronger."   For example, Mr. Rittichier admitted that EMCORE "delivered [its] first EN-300 Inertial Measurement units to a major customer who will begin flight testing very soon.   This customer described the first test results as a game changer."   But Phoenix developed the EN-300 unit and is entitled to a royalty on EMCORE's sales of that unit.   Mr. Ritticher thus admitted, as recently as May 3, just seven days before EMCORE improperly terminated the Agreements, that EMCORE was continuing to sell FOG products and derivatives on which Phoenix is entitled to a royalty.[7]

67.     In a press release on May 3, 2018, EMCORE also announced that it:

> has entered into an agreement with a major U.S. prime contractor in the defense industry to design an innovative Inertial Measurement Unit (IMU) for airborne line-of-sight stabilization and navigation applications.   As part of this contract EMCORE has agreed to deliver flight demonstration hardware by the end of this year to support flight testing early next year. This agreement is expected to be a precursor to a production contract estimated at several hundred units per year starting in 2020 and beyond.

---

[7] Mr. Rittichier's statement is also an admission that Phoenix's technology was viable, indeed it was a "game changer."

**EXHIBIT 2**
**Page 48**

*HIGHLY CONFIDENTIAL*

David Faulkner, EMCORE's Vice President and General Manager of Aerospace & Defense, stated at the time of the announcement that: "EMCORE demonstrated the versatility to configure its IMU technology to be distributed within the customer's tight volume and space constraints, which was integral to being selected for this program[.]" Mr. Rittichier also added that: "This agreement with one of our most important customers is another key design win for our Navigation business[.]"

68.     Only about three companies make the targeting products referenced in EMCORE's May 3 announcement.  Phoenix originated marketing materials and directly supported EMCORE in meetings at two of these companies.  Sales to any of these companies would be derivative of Phoenix-licensed technology.

69.     EMCORE expects a "production contract estimated at several hundred units per year starting in 2020 and beyond" for this contract.  These units typically sell for between $23,000 to $35,000 apiece.  Assuming 300 per year at $30,000 results in $9,000,000 in total sales, which would result in a $675,000 royalty due to Phoenix.  But EMCORE improperly terminated the Agreements just seven days after making this announcement, further confirming that the terminations were pretextual and meant only to cut Phoenix out of the picture so EMCORE could keep money due to Phoenix for itself.

### EMCORE's Breaches are Ongoing

70.     EMCORE continues to market and sell royalty-bearing, Phoenix-developed FOGs and IMUs on its website.

71.     Attached as **Exhibit D** is a brochure for Advanced Fiber Optics Solutions for Government, Aerospace & Defense that appeared on EMCORE's website on the date of

**EXHIBIT 2**
**Page 49**

*HIGHLY CONFIDENTIAL*

Phoenix's original Demand (June 12, 2018) (over one month after EMCORE purported to terminate the Agreements).  The brochure touts, among other things:

    a.    EMCORE's FOG offerings, including the EMP-1, EMP-3, EMP-4, EMP-7, EMP-1.2K and EMP-1.3K - *each of which Phoenix developed*; and

    b.    EMCORE's IMU offerings, including the MINAV-1, MINAV-2, AVAM, PAVAM, and EN-300 - *each of which Phoenix developed*.

72.    Attached as **Exhibit E** is a screenshot of EMCORE's webpage for "Fiber Optic Gyros, Sensors & Navigation Systems," dated June 12, 2018.   The webpage states that "EMCORE'S IMUs and navigation systems deliver high-precision with up to five-times better performance than competing units on compact, portable form-factors that provides standalone aircraft grade navigator performance at 1/3 the size of competing systems."  The webpage further lists the following **currently available** models of EMCORE products as of the date of Phoenix's original Demand (June 12, 2018), each of which Phoenix developed:  EN-300; AVAM; and PAVAM.

73.    Attached as **Exhibit F** is a screenshot of EMCORE's webpage for "Fiber Optic Gyros, Sensors & Navigation Systems," dated June 12, 2018.   The webpage states that EMCORE'S "FOGs are setting the new benchmark for more accurate and economical fiber optic gyro components and systems in a wide variety of guidance, navigation and aeronautics applications including platform stabilization of camera systems on aircrafts and UAVAs, north finding/tracking, and man-portable and tripod target locator systems."  The webpage further lists the following **currently available** models of EMCORE products, each of which Phoenix developed:  EMP-1; EMP-3; EMP-4; EMP-7; EMP-1.2K; and EMP-1.3K.

**EXHIBIT 2**
**Page 50**

*HIGHLY CONFIDENTIAL*

74.     Attached as **Exhibit G** is EMCORE's "Commercial Pricing for Fiber Optic Gyro Components," dated May 2018 and available on EMCORE's website as of the date of Phoenix's original Demand.   The document proves that EMCORE was **currently offering** for sale Phoenix-developed technologies, including the following 14 products:  EMP-1 FOG; EMP-1 HP FOG; EMP-3 FOG; EMP-4 FOG; EMP-7 FOG; EMP-1.2 (Int.) FOG; EMP-1.2 (U.S.) FOG; EMP-1.3 (Int.) FOG; EMP-1.3 (U.S.) FOG; EN-300 IMU; EN-300E IMU; and EN-1000 MINAV.

75.     Although EMCORE is offering the above products for sale, it has not paid any royalties on them to Phoenix since 2017, and, by improperly terminating the License Agreements, signaled its intent not to pay royalties in the future.[8]

76.     In apparent response to this arbitration, EMCORE rebranded the "EMP" FOGs as "EG" FOGs on its website.[9]  But EMCORE's own marketing materials show that the EMP and EG FOGs are one and the same.  The specifications have not changed, nor the pricing—only the name.

77.     For example, as part of its rebranding efforts, EMCORE updated the marketing datasheets and price list on its website.  Even a cursory comparison of the EMP-1 FOG datasheet

---

[8] As a result of the financial pressure that EMCORE's improper termination has placed on Phoenix, which received nearly 100% of its revenues from EMCORE, Phoenix filed for an injunction in aid of arbitration pursuant to CPLR 7502(c) shortly after initiating this arbitration.  On August 8, 2018, Justice Saliann Scarpulla of the Commercial Division of the New York Supreme Court ordered EMCORE to make periodic payments of royalties on FOG products that EMCORE admitted it continues to sell, and on which it historically paid Phoenix a royalty, into an escrow account from which Phoenix can draw on a monthly basis to pay its expenses pending this arbitration. Justice Scarpulla further ordered EMCORE to provide Phoenix with a royalty report showing EMCORE's 2018 FOG sales.  That report shows a precipitous uptick in EMCORE's FOG sales in 2018.  For example, as noted above, EMCORE paid Phoenix approximately $700,000 in royalties during the parties' 10-year relationship.  EMCORE's own reporting indicates that its sales of FOG products *in just the first eight months of 2018* results in royalties of *at least $300,000* due to Phoenix from sales of FOG products on which EMCORE had paid Phoenix royalties before purporting to terminate the License Agreements.

[9] "EMP" stands for EMCORE and Phoenix.

**EXHIBIT 2**
**Page 51**

*HIGHLY CONFIDENTIAL*

that appeared on EMCORE's website as of the time Phoenix filed its original complaint with its

new July 2018 "EMCORE-Hawkeye EG-200 Lithium Niobate" FOG datasheet demonstrates

***that they are the same FOG***.  *Compare* **Exhibit H** (former datasheet) *with* **Exhibit I** (new July

2018 datasheet).  Not only are the specifications exactly the same, but EMCORE even neglected

to change one reference to the "EMP-1" in the EG-200 datasheet.  *See* Ex. I (touting that "[i]n

addition, ***the EMP-1*** can be calibrated internally for better thermal effect . . . .") (emphasis

added).

78.    EMCORE also "updated" its June 2018 price list, which further proves that it

continues to sell Phoenix-developed technology under the new "EG" prefix.  Indeed, the "new"

EG FOG prices are identical to the prior EMP prices, down to the dollar:

| Phoenix-developed EMP FOGs EMCORE's May 2018 Price List | | | EMCORE's Hawkeye EG Series EMCORE's June 2018 Price List | | |
|---|---|---|---|---|---|
| Model | 1 Unit Price | 10 Unit Price | Model | 1 Unit Price | 10 Unit Price |
| **EMP-1** | $17,599 | $15,303 | **EG-200** | $17,599 | $15,303 |
| **EMP-3** | $18,491 | $16,079 | **EG-400** | $18,491 | $16,079 |
| **EMP-1.2 (Int.)** | $38,540 | $33,513 | **EG-1200** | $38,540 | $33,513 |
| **EMP-1.3 (Int.)** | $39,433 | $34,289 | **EG-1300** | $39,433 | $34,289 |

***EMCORE Patented Phoenix's Proprietary Technology and Disclosed it For the World to See***

79.    As part of its rebranding efforts, EMCORE began emblazoning the outer casings

of its "Hawkeye EG-200" FOG, "Hawkeye EG-120" FOG, and "EN-300" IMU with US Patent

No. 8,773,665 (the "'665 Patent").  Attached as **Exhibits J** and **K**, respectively, are a screenshot

**EXHIBIT 2**
**Page 52**

*HIGHLY CONFIDENTIAL*

and datasheet for EMCORE products that claim the '665 Patent protects the marketed technology. *See also* Ex. I (listing the '665 Patent as covering the EG-200).

80. The '665 Patent, attached as **Exhibit L**, takes directly from Phoenix's proprietary and novel compact FOG design, which Phoenix provided to EMCORE under the MOU and EMP-1 License Agreement, and which Phoenix attached to the EMP-1 License Agreement. The figure on the left below comes from the confidential "EMP-1 (Proto FOG) Design Review" slide deck that Phoenix prepared for EMCORE and which the parties attached to and incorporated within the EMP-1 License Agreement. *See* B. The figure on the right comes from EMCORE's '665 Patent:




Figure from Phoenix's August 22, 2008          Figure from EMCORE's '665 Patent
"EMP-1 (Proto FOG) Design Review" slide deck     (filed April 1, 2011, granted July 2014)

81. The two figures are remarkably, almost exactly the same. That EMCORE maintains that the '665 Patent covers its "EG" FOGs and EN-300 IMU proves that EMCORE continues to market and sell EMP-1 FOG Technology and further confirms that EMCORE has misappropriated Phoenix's technology and disclosed it for the Patent Trademark Office, and indeed the world, to see in a patent application.

29

**EXHIBIT 2**
**Page 53**

82.     Pursuant to Section 7 of the License Agreements, "derivatives or improvements to the EMP-1 FOG Technology *do not transfer ownership of Phoenix provided technology to EMCORE or relieve EMCORE of its requirement and duty to pay royalties on EMP-1 FOGs .* . . ." (emphasis added). *See also* EMP-1 Agreement § 1 (defining "Improvements" to mean "all improvements, modifications, or changes, revisions, and updates, including alternative forms, derivative products and enhancements, made by Phoenix *or EMCORE* to an EMP-1 FOG and its derivatives.") (emphasis added).   By patenting Phoenix's NOVEL technology without naming the Phoenix employees Glenn Gage and Robert Hansen, who developed the claimed technology, as inventors, EMCORE improperly asserted and misrepresented its ownership of the patented technology, and thus committed a further breach of the License Agreements.

83.     The '665 Patent claims a "small, highly integrated form factor," which is an aspect of FOG design that defines and prescribes the size, shape, and other physical specifications and configurations of components.   In other words, the novel and non-obvious invention claimed by the '665 Patent is not the individual components, which all existed in the prior art, but instead the arrangement of the components, which allow for a highly accurate, low-noise single-axis FOG in a single integrated house. *See* Ex. L.   Indeed, during prosecution of the '665 Patent, in response to a rejection of the then-pending claims, EMCORE amended its claims and argued that prior art cited by the Examiner failed to teach or suggest all of the elements of the newly amended claims.   In particular, EMCORE argued that this cited prior art failed to disclose or teach "the invention's small, highly integrated form factor."   See April 24, 2014 Office Action Response at 8-9.   This is precisely what Phoenix provided. *See* Ex. B at Appendix A.

**EXHIBIT 2**
**Page 54**

*HIGHLY CONFIDENTIAL*

84.     Nevertheless, EMCORE filed the '665 Patent application on April 1, 2011 as U.S. Patent Application No. 13/078,428, identifying EMCORE employees Ron Logan and Dr. Ka Kha Wong as the inventors.  Phoenix employees, Glenn Gage and Robert Hansen, who had conceived of the invention, reduced it to practice, and confidentially disclosed it to EMCORE long before EMCORE filed its application, are referenced nowhere in the application.

85.     Mr. Gage, whose expertise is in the mechanical design of FOGs, began developing the concept for a compact, single-axis FOG at least as early as March 2008 in collaboration with Mr. Hansen, who advised on the design and placement of electronic circuitry and software code within the FOG.   This development activity occurred prior to any collaboration with EMCORE and was fully funded by Phoenix.  Indeed, by June 15, 2008, Mr. Gage and Mr. Hansen had fully developed the FOG configuration.

86.     Later, after the parties had executed their NDA, Phoenix confidentially shared its proprietary design with EMCORE in the "EMP-1 (Proto FOG) Design Review" slide deck.  The parties incorporated this slide deck into the EMP-1 License Agreement to define the technology that was the subject of the Agreement.  *See* EMP-1 Agreement § 1 ("'FOG' or 'FOGs' shall mean an EMP-1 single axis fiber optic gyro and its derivatives as described in the EMP-1 design review of August 22, 2008 ('EMP-1 Design Review'), a copy of which is attached hereto as **Exhibit A**").   Unbeknownst to Phoenix, years later, EMCORE patented the very design disclosed in the presentation, erroneously claiming its employees invented the proprietary configurations.

87.     The '665 Patent's claims are directed to the design of a "compact fiber optic gyroscope"—a design that was fully and solely conceived by Phoenix employees.

**COUNT I**
**(Breach of the EMP-1 Agreement)**

**EXHIBIT 2**
**Page 55**

*HIGHLY CONFIDENTIAL*

88.     Phoenix repeats and re-alleges paragraphs 1 through 87 as if fully set forth herein.

89.     The EMP-1 Agreement is a valid and binding written agreement between Phoenix and EMCORE.

90.     The EMP-1 Agreement was made for valid consideration.

91.     Phoenix performed its contractual duties under the EMP-1 Agreement, or was otherwise excused from performance.

92.     As a result of the conduct described above, EMCORE breached the EMP-1 Agreement by, *inter alia*:  (1) failing to pay Phoenix at least $90,000 in royalties accrued through the first quarter of 2018 or delivering the requisite royalty report on or by April 30, 2018, and again failing to pay royalties or providing the requisite royalty report for second quarter 2018 on or by July 31, 2018; (2) terminating the EMP-1 Agreement for material breach without providing Phoenix with the requisite sixty (60) days' notice and period in which to cure, and later purporting to terminate the agreement "for convenience" without following the requirements in the License Agreements; (3) initiating a lawsuit in California state court, notwithstanding the mandatory arbitration provisions of the EMP-1 Agreement; (4) misappropriating Phoenix's trade secrets, including, but not limited to, by continuing to sell Phoenix's technology without paying royalties and patenting Phoenix's proprietary and novel technology; and (5) selling and/or currently offering for sale licensed, royalty-bearing, Phoenix-developed EMP-1 FOG products, and other products derivative thereof, or which contain modifications or improvements thereto, (i) without paying Phoenix the required royalties, and (ii) after purporting to terminate the EMP-1 Agreement.

93.     As a result of EMCORE's breach of the EMP-1 Agreement, Phoenix has suffered damages in an amount to be proven in this Arbitration.

**EXHIBIT 2**

**Page 56**

*HIGHLY CONFIDENTIAL*

## COUNT II
### (Breach of the EMP-1k Agreement)

94.     Phoenix repeats and re-alleges paragraphs 1 through 93 as if fully set forth herein.

95.     The EMP-1k Agreement is a valid and binding written agreement between Phoenix and EMCORE.

96.     The EMP-1k Agreement was made for valid consideration.

97.     Phoenix performed its contractual duties under the EMP-1k Agreement, or was otherwise excused from performance.

98.     As a result of the conduct described above, EMCORE breached the EMP-1k Agreement by, *inter alia*:  (1) failing to pay Phoenix at least $90,000 in royalties accrued through the first quarter of 2018, or delivering the requisite royalty report on or by April 30, 2018, and again failing to pay royalties or providing the requisite royalty report for second quarter 2018 on or by July 31, 2018; (2) terminating the EMP-1k Agreement for material breach without providing Phoenix with the requisite sixty (60) days' notice and period in which to cure, and later purporting to terminate the agreement "for convenience" without following the requirements in the License Agreements; (3) initiating a lawsuit in California state court, notwithstanding the mandatory arbitration provisions of the EMP-1k Agreement; (4) misappropriating Phoenix's trade secrets, including, but not limited to, by continuing to sell Phoenix's technology without paying royalties and patenting Phoenix's proprietary and novel technology; and (5) selling and/or currently offering for sale licensed, royalty-bearing, Phoenix-developed EMP-1k FOG products, and other products derivative thereof, or which contain modifications or improvements thereto, (i) without paying Phoenix the required royalties, and (ii) after purporting to terminate the EMP-1k Agreement.

**EXHIBIT 2**
**Page 57**

*HIGHLY CONFIDENTIAL*

99.     As a result of EMCORE's breach of the EMP-1k Agreement, Phoenix has suffered damages in an amount to be proven in this Arbitration.

**COUNT III**
**(Breach of the Memorandum of Understanding)**

100.    Phoenix repeats and re-alleges paragraphs 1 through 99 as if fully set forth herein.

101.    The MOU is a valid and binding written agreement between Phoenix and EMCORE.

102.    The MOU was made for valid consideration.

103.    Phoenix performed its contractual duties under the MOU, or was otherwise excused from performance.

104.    As a result of the conduct described above, EMCORE breached the MOU by, inter alia, (1) failing to provide Phoenix with "not less than 25% of the engineering activity" per Sections 2.4 and 2.5, including, but not limited to, on the Hawkeye$^{TM}$ products; (2) failing to support Phoenix in accordance with the MOU by, for example, failing to provide standard laboratory equipment necessary to develop, debug, and evaluate FOGs; (3) failing to provide Phoenix with functional components in accordance with its responsibilities under the MOU, including, but not limited to integrated optical circuits; and (4) misappropriating Phoenix's trade secrets, including, but not limited to, by exposing them to the PTO and the public through a patent filing, and failing to abide by the terms of the parties' NDA.

105.    As a result of EMCORE's breach of the MOU, Phoenix has suffered damages in an amount to be proven in this Arbitration.

**COUNT IV**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

**EXHIBIT 2**
**Page 58**

*HiGHLY CONFIDENTIAL*

106.    Phoenix repeats and re-alleges paragraphs 1 through 105 as if fully set forth herein.

107.    The EMP-1 and EMP-1k License Agreements and MOU each contain an implied covenant of good faith and fair dealing that was breached by EMCORE through its bad faith conduct.  Through the Agreements, EMCORE gained access to a highly-skilled group of the foremost FOG experts in the industry, without needing to incur the administrative overhead associated with bringing those experts in-house.  In exchange for an agreed-upon royalty, EMCORE could market and sell technology developed by that same highly-skilled group of experts.  Now, after inducing Phoenix to enter into these Agreements with promises of engineering work, assistance, and equipment it never provided, and after enjoying the benefits of these Agreements for a decade, EMCORE has launched a bad faith campaign to oust Phoenix, steal its technology, besmirch its founders' well-earned positive reputations, and sell Phoenix-developed technology without paying the royalties it agreed to pay.  Moreover, EMCORE has attempted to cover up its wrongful conduct and further evade its contractual duties by rebranding, in name only, the Phoenix-derived EMP FOGs as "EG."  As shown by the EMCORE's datasheets, pricing, and by its attribution of the '665 Patent to the product, however, the EG Hawkeye FOGs and EMP FOGs are the same products; EMCORE's actions only serve to underscore its bad faith and unfair dealings.

108.    EMCORE's conduct deprives Phoenix of the rights and benefits Phoenix is entitled to receive under the Agreements, including, but not limited to, engineering activity and royalties.  EMCORE's strategy to force Phoenix out while retaining – and indeed asserting ownership claims over – Phoenix's technology is a breach of the implied covenant of good faith and fair dealing.

**EXHIBIT 2**
**Page 59**

*HiGHLY CONFIDENTIAL*

109.   EMCORE's actions, as alleged above, constituted independent and separate breaches of the MOU, the EMP-1 Agreement, and the EMP-1k Agreement.

110.   As a result of EMCORE's breaches of the implied covenant of good faith and fair dealing, Phoenix has suffered damages in an amount to be proven in this Arbitration.

**COUNT V**
**(Misappropriation of Trade Secrets Under the Defend Trade Secrets Act ("DTSA")**
**18 U.S.C. §§ 1836, *et seq.*)**

111.   Phoenix repeats and re-alleges paragraphs 1 through 110 as if fully set forth herein.

112.   Phoenix owns or has in its possession certain technical information and know how relating to, without limitation, the specification, evaluation, simulation, design, implementation, assembly, manufacture, procurement of components or subsystems from suppliers or subcontractors, configuration management, quality control, testing, application engineering, customization, installation and service of FOG and IMU and navigational products. Phoenix shared this information with EMCORE pursuant to the parties' Agreements, which require EMCORE to maintain its secrecy. Phoenix has taken all reasonable precautions to maintain its trade secrets in confidence and to prevent their disclosure to or use by unauthorized persons.

113.   For nearly a decade, EMCORE lacked the ability to develop highly-precise FOGs and IMUs in-house, and therefore engaged Phoenix as its supplier of that technology. On May 10, 2018, and later on July 16, 2018, EMCORE purported to terminate the parties' Agreements, which granted EMCORE a license to make, use, sell, offer for sale, lease, import and export EMP-1 and EMP-1k FOG and EMP-1 and EMP-1k Derivative products. EMCORE nevertheless has confirmed in public statements that it is moving aggressively into the navigation space, and that it is also continuing to sell Phoenix-developed FOGs, IMUs, and other products derived,

**EXHIBIT 2**
**Page 60**

*HIGHLY CONFIDENTIAL*

modified, or improved therefrom. Those products include, but are not limited to, the Hawkeye™ FOG, MTSB, and EN-300. EMCORE likewise continues to offer for sale numerous Phoenix-developed, royalty-bearing products and other products derived, modified, or improved therefrom on its website, including, but not limited to, the: EMP-1 FOG; EMP-1 HP FOG; EMP-3 FOG; EMP-4 FOG; EMP-7 FOG; EMP-1.2 (Int.) FOG; EMP-1.2 (U.S.) FOG; EMP-1.3 (Int.) FOG; EMP-1.3 (U.S.) FOG; EG-200; EG-120 FOG; EN-300 IMU; EN-300E IMU; and EN-1000 MINAV. Indeed, EMCORE now marks its FOG products with the '665 Patent number. As described above, that invention was fully conceived and reduced to practice by individuals from Phoenix and only shared with EMCORE under the protections of the parties' agreements. That EMCORE maintains that the '665 Patent covers its "new" EG FOGs proves that EMCORE continues to market and sell Phoenix technology, and indeed further confirms that EMCORE has misappropriated Phoenix's technology by disclosing it for the PTO and the world to see in a patent application.

114.    The conduct described in the foregoing paragraphs constitutes "actual" trade secret misappropriation by EMCORE under the DTSA.

115.    The conduct also amounts to "threatened" trade secret misappropriation under the DTSA because EMCORE has signaled its intent to continue to sell these products for, at least, the next four years. Furthermore, to develop and commercialize these products, EMCORE will necessarily need to share Phoenix's licensed technology with other developers because EMCORE lacks the in-house development capabilities to do so on its own. This is a violation of the parties' Agreements and also constitutes "threatened" trade secret misappropriation.

**EXHIBIT 2**
**Page 61**

*HIGHLY CONFIDENTIAL*

116.   Phoenix has been and is being irreparably harmed by EMCORE's misappropriation of its trade secrets.   Without injunctive relief, Phoenix will continue to be irreparably harmed by EMCORE's misappropriation of its trade secrets.

117.   Phoenix is entitled to the injunctive relief set forth in its Prayer for Relief to prevent EMCORE's continued actual and/or threatened misappropriation of its trade secrets.

118.   EMCORE's misappropriation of Phoenix's trade secrets was willful and malicious.

119.   Phoenix is entitled to money damages and the attorneys' fees that it incurs in this action.  EMCORE is also entitled to exemplary damages pursuant to 18 U.S.C. § 1836.

## COUNT VI
### (Common Law Misappropriation of Trade Secrets)

120.   Phoenix repeats and re-alleges paragraphs 1 through 119 as if fully set forth herein.

121.   Phoenix owns or has in its possession certain technical information and know how relating to, without limitation, the specification, evaluation, simulation, design, implementation, assembly, manufacture, procurement of components or subsystems from suppliers or subcontractors, configuration management, quality control, testing, application engineering, customization, installation and service of FOG and IMU and navigational products.  Phoenix shared this information with EMCORE pursuant to the parties' Agreements, which require EMCORE to maintain its secrecy.

122.   Phoenix has taken all reasonable precautions to maintain its trade secrets in confidence and to prevent their disclosure to or use by unauthorized persons.

123.   EMCORE presently is using and intends to use Phoenix's trade secrets in breach of the parties' Agreements, and in further breach of its duties owed to Phoenix.

**EXHIBIT 2**
**Page 62**

*HIGHLY CONFIDENTIAL*

124.    As a result of EMCORE's misappropriation of Phoenix's trade secrets, Phoenix has suffered damages in an amount to be proven in this Arbitration.

### COUNT VII
**(Conversion)**

125.    Phoenix repeats and re-alleges paragraphs 1 through 124 as if fully set forth herein.

126.    EMCORE's actions and omissions, as alleged above, were intended to and, in fact, did interfere with and appropriate to itself, without justification, rights, benefits, and interest in Phoenix's property, to the exclusion of Phoenix.

127.    EMCORE's actions were committed with wanton dishonesty and constitute conversion of Phoenix's interests.

128.    As a result of EMCORE's breach of the Agreements, Phoenix has suffered damages in an amount to be proven in this Arbitration.

### COUNT VIII
**(Unjust Enrichment)**

129.    Phoenix repeats and re-alleges paragraphs 1 through 128 as if fully set forth herein.

130.    EMCORE's acts resulted in its unjustified, unlawful receipt of money or property.

131.    By reason of EMCORE's unlawful actions, it was unjustly enriched in an amount to be proven in this Arbitration.

132.    Phoenix is entitled to recover the amounts by which EMCORE was unlawfully and unjustly enriched by virtue of its wrongful conduct.

### COUNT IX
**(Correction of Inventorship of U.S. Patent No. 8,773,665 under 35 U.S.C. § 256)**

**EXHIBIT 2**
**Page 63**

*HIGHLY CONFIDENTIAL*

133.    Phoenix repeats and re-alleges paragraphs 1 through 132 as if fully set forth herein.

134.    The '665 Patent was filed on April 1, 2011 as U.S. Patent Application No. 13/078,428. On June 8, 2014, the PTO issued the '665 Patent, entitled "Compact Fiber Optic Gyroscopes," to erroneously named inventors Mr. Logan and Mr. Wong. Mr. Logan and Mr. Wong then assigned their purported rights in the patent to EMCORE. During prosecution of the '665 Patent, in response to a rejection of the then-pending claims, EMCORE amended its claims and argued that prior art cited by the Examiner failed to teach or suggest all of the elements of the newly amended claims. In particular, EMCORE argued that this cited prior art failed to disclose or teach "the invention's small, highly integrated form factor."

135.    Phoenix employees, Glen Gage and Robert Hansen, fully conceived and reduced to practice the invention claimed in the '665 Patent and are thus the true and sole inventors of such. EMCORE omitted each of them from the '665 Patent without their knowledge and without deceptive intent on the part of Messrs. Gage and Hansen. Both individuals contributed in a significant manner to the conception of the invention claimed in the '665 Patent.

136.    Pursuant to 35 U.S.C. § 256, the error of omitting Mr. Gage and Mr. Hansen as inventors of the '665 Patent and erroneously naming Mr. Logan and Mr. Wong as such may be corrected. Phoenix requests that the Arbitrator award this relief and any other relief, in equity or otherwise, the Arbitrator deems appropriate.

## COUNT X
### (Declaratory Judgment – Ownership of the '665 Patent)

137.    Phoenix repeats and re-alleges paragraphs 1 through 136 as if fully set forth herein.

**EXHIBIT 2**
**Page 64**

*HIGHLY CONFIDENTIAL*

138.     Mr. Gage and Mr. Hansen, both Phoenix employees, are the true and only inventors of the '665 Patent. Mr. Gage and Mr. Hansen have assigned their ownership rights in the invention to Phoenix.

139.     Phoenix fully funded the development work underlying the '665 Patent, which occurred prior to Phoenix's collaboration with EMCORE. Pursuant to the License Agreements, all technology "developed solely by Phoenix . . . shall be the sole property of Phoenix." *See* License Agreements § 7. The Agreements further provide that "derivatives or improvements to the EMP-1 FOG Technology do not transfer ownership of Phoenix provided technology to EMCORE." *Id.* Accordingly, EMCORE has no ownership rights to the '665 Patent and no rights to the '665 Patent via assignment from Mr. Wong and Mr. Logan, because, as discussed above they did not contribute to the conception of the invention in the '665 Patent and had no ownership rights to assign to EMCORE.

140.     Accordingly, Phoenix requests that the Arbitrator declare that Phoenix is the sole owner of the '665 Patent.

<u>COUNT X</u>
**(Declaratory Judgment – Contractual Obligations)**

141.     Phoenix repeats and re-alleges paragraphs 1 through 140 as if fully set forth herein.

142.     An actual, justiciable controversy exists between the parties that is not amenable to resolution by resort to conventional remedies, and as to which Phoenix has no adequate remedy at law.

143.     As described above, EMCORE has breached, and intends further breaches of the License Agreements and the MOU.

**EXHIBIT 2**
**Page 65**

*HIGHLY CONFIDENTIAL*

144.    Accordingly, in order to protect its rights, Phoenix seeks a declaration from this Tribunal as set forth below.

145.    This declaratory judgment would have an immediate and practical effect on the parties' conduct by clarifying the parties' contractual obligations so that the parties may act in accordance therewith.

## PRAYER FOR RELIEF

WHEREFORE, Phoenix respectfully requests that the Arbitrator award relief as follows:

A.      Pursuant to Count One, find EMCORE in breach of the EMP-1 Agreement and award damages in an amount to be proven in this Arbitration, and/or other appropriate relief;

B.      Pursuant to Count Two, find EMCORE in breach of the EMP-1k Agreement and award damages in an amount to be proven in this Arbitration, and/or other appropriate relief;

C.      Pursuant to Count Three, find EMCORE in breach of the MOU, and award damages in an amount to be proven in this Arbitration, and/or other appropriate relief, including, but not limited to, voiding the non-competition provisions of the MOU (Section 11);

D.      Pursuant to Count Four, find EMCORE in breach of the covenant of good faith and fair dealing and award damages in an amount to be proven in this Arbitration, and/or other appropriate relief;

**EXHIBIT 2**
**Page 66**

*HiGHLY CONFIDENTIAL*

E.     Pursuant to Counts Five and Six, find EMCORE has willfully and maliciously misappropriated Phoenix's technology and award damages pursuant to the DTSA and common law, including, but not limited to injunctive relief, money damages in an amount to be proven in this Arbitration, exemplary damages, and/or other appropriate relief;

F.     Pursuant to Counts Seven and Eight, find EMCORE has converted Phoenix's technology and that EMCORE has been unjustly enriched, and award damages in an amount to be proven in this Arbitration, and/or other appropriate relief;

G.     Pursuant to Count Nine, correct the inventorship of the '665 Patent by naming Glen Gage and Robert Hansen inventors and removing Ka Kha Wong and Ron Logan as such, and award any other relief that the Arbitrator finds equity warrants;

H.     Pursuant to Count Ten, declare that Phoenix is the sole owner of the '665 Patent and that EMCORE has no rights in or to the patent;

I.     Pursuant to Count Eleven, declare as follows:

    a.     EMCORE is in breach of the License Agreements by failing to pay required royalties to Phoenix and to issue the required accountings, by failing to follow the mandatory termination procedures therein and provide Phoenix with the requisite sixty (60) days' notice of termination for material breach and opportunity to cure, by failing to follow the for convenience termination procedures therein and provide Phoenix with the required royalty payment and final royalty report within sixty (60) days of the notice of termination, by initiating a lawsuit in California state court,

**EXHIBIT 2**
**Page 67**

*HIGHLY CONFIDENTIAL*

notwithstanding the License Agreements' mandatory arbitration provisions, and by misappropriating Phoenix's trade secrets;

b. EMCORE's continued sale of royalty-bearing Phoenix technology is an implied election to continue under the License Agreements as if they were never terminated, and EMCORE must cease sales of Phoenix technology and derivatives or pay Phoenix royalties on each and every sale of Phoenix technology and derivatives (past, present, future) until such time as the Arbitrator renders his or her decision;

c. EMCORE's breach of the License Agreement excuses any of Phoenix's or its members' non-competition obligations, in their entirety, under Section 11 of the MOU, or that such obligations are otherwise null and void and of no effect; and

d. EMCORE is in breach of the MOU by failing to provide Phoenix with at least 25% of engineering activity <u>and</u> EMCORE must cease all FOG or IMU engineering activity, <u>or</u> provide Phoenix with payment equal to no less than 25% of all FOG or IMU engineering activity that EMCORE did not offer to Phoenix <u>and</u> provide Phoenix with the opportunity to perform at least 25% of all FOG and IMU engineering activity until such time as the Arbitrator renders his or her decision.

J. For pre- and post-judgment interest;

K. For temporary, preliminary, and permanent injunctive relief;

L. For Phoenix's costs and attorneys' fees, pursuant to Section 13 of the MOU, Section 11 of the EMP-1 Agreement, and Section 8 of the EMP-1k Agreement,

**EXHIBIT 2**

**Page 68**

*HIGHLY CONFIDENTIAL*

incurred in connection with this proceeding and any related litigation, including, but not limited to the California proceeding, which EMCORE improperly initiated and voluntarily dismissed, and the special proceeding pursuant to CPLR 7502(c) that Phoenix was forced to initiate in aid of arbitration; and

M.     For such other and further relief as the Arbitrator deems just and proper.

Respectfully submitted,

Michael N. Sheetz (BBO #548776)
Michael J. McMahon (BBO #679053)
Elizabeth Trafton (BBO # 693969)
COOLEY LLP
500 Boylston Street
Boston, MA  02116-3736
Tel:  (617) 937-2300
Fax:  (617) 937-2400

*Counsel to Claimant Phoenix Navigation*
*Components LLC*

August 31, 2018

**EXHIBIT 2**
**Page 69**